**In re PONCE DE LEON
1403, INC., Debtor.**

**No. 11–07920 (ESL).**

United States Bankruptcy Court,
D. Puerto Rico.

Signed Nov. 25, 2014.

Luisa S. Valle Castro, C. Conde & Associates, Carmen D. Conde Torres, San Juan, PR, for Debtor.

Hermann D. Bauer Alvarez, Ubaldo M. Fernandez Barrera, Luis C. Marini Biaggi, Nayuan Zouairabani Trinidad, O'neill & Borges, Jean Philip Gauthier Inesta, Jean Philip Gauthier Law Offfice, San Juan, PR, for Creditor.

## OPINION AND ORDER

ENRIQUE S. LAMOUTTE,
Bankruptcy Judge.

This case is before the court upon Ponce de León, 1403, Inc.'s (hereinafter referred to as "Debtor" or "Ponce de León") *Motion Requesting Valuation Hearing under 11 U.S.C. § 506 and Fed. R. Bankr. P. 3012 in Order to Proceed under Section 1129(b)(2)(A)(iii) as to PRLP* (hereinafter referred to as the "motion requesting valuation"). The Debtor states in its motion requesting valuation that it will proceed with the confirmation of its Plan of Reorganization under Scenario B of the Plan of Reorganization [1] pursuant to the provisions

1. The two (2) scenarios proposed by Debtor in its *Amended Plan of Reorganization Dated January 25, 2013* (Docket No. 177) are the following:

"**Scenario A:** Debtor will retain the property and PRLP will retain the liens securing its claim(s). On account of such claim PRLP will receive deferred cash payments totaling the full amount of its claim, of a value as of the effective date of the plan estimated in $10.1 million approx. (See payment schedule for payments of principal and interest), within 36 months. The Debtor will continue the sale of the unsold units for a term of thirty six (36)

of section 1129(b)(2)(A)(iii) of the Bankruptcy Code, surrendering "all the property" that constitutes the collateral of PRLP 2011 Holdings LLC (hereinafter referred to as "PRLP"). Thus, the Debtor alleges that by surrendering the collateral the secured creditor will receive the indubitable equivalent of its secured claim.

The Debtor requested a valuation hearing to determine the value of the collateral (Docket No. 314). PRLP in its *Supplement to Objection to Confirmation of Amended Plan of Reorganization (Docket No. 177)* objected to debtor's Amended Plan of Reorganization for various reasons. However, the reasons which are in controversy and are directly affected by the valuation of the collateral are the following: (i) Scenario B fails to provide for the payment of PRLP's unsecured deficiency claim because Debtor will not be able to pay the entirety of PRLP's allowed claim, even with the turnover of the project; (ii) the

plan is not confirmable because it fails to comply with the indubitable requirements of 11 U.S.C. § 1129(b)(2)(A)(iii) and (iii) the surrender of the collateral does not satisfy PRLP's allowed claim, due to the $2,000,000 unsecured deficiency (Docket No. 327). The Debtor filed its *Response to PRLP's Objections to Confirmation of Amended Plan Dated January 25, 2013, as Supplemented (Dkts.177, 181, 194, 315, 327, 336)* (Docket No. 352) (valuation hearing and hearing for confirmation scheduled for the same date).

Subsequent to the confirmation hearing, the Debtor filed a *Memorandum of Law as to the Valuation Method to be Used under 11 U.S.C. 506 and 11 U.S.C. § 1129(b)(2)(A)(iii) when the Complete Collateral is to be Surrendered as the Indubitable Equivalent and Applicable Appraisal Standards and Guidelines* arguing that the appropriate methodology that should be employed is the aggregate of the

months with a mutually satisfactory budget for the use of the cash collateral and a strong and well-planned marketing strategy and lease program to be agreed with the secured creditor, before the confirmation hearing. The Debtor will provide to PRLP prior to confirmation the proposed budget and marketing plan, for its approval. The budget will include the cost inherent to the sale of the units and the operating expenses including the cost of a marketing plan to be approved jointly. Upon full payment to PRLP, which is expected within the first 36 months of the plan, it will release the Parties of any and all obligations in connection with the claim filed in the United States Bankruptcy Court, case no.: 11–07920(ESL). All other litigation between the parties, including but not limited to the litigation in the bankruptcy case and appeal no.: 12–01577(JAF) filed before the United States District Court will be voluntarily dismissed. Pending litigation against shareholders in state court San Juan Ward, in case no.: KCD 2012–30551, will be dismissed 'without prejudice,' upon confirmation of the plan.
**Scenario B:** In the event the Debtor cannot reach an agreement with the secured creditor

under Scenario A, for the sale of the units and the full payment of its secured claim within 36 months, then the Debtor will surrender to PRLP property of the estate equal in value or equivalent to the value of PRLP's secured claim as of the confirmation date. This property will be the remaining residential units at Metro Plaza Towers Condominium project, the commercial spaces and parking spaces. Pursuant to the appraisal report dated December 4, 2012, which includes a '20% discount rate,' the total amount of the units to be surrendered are the indubitable equivalent and sufficient to cover the entire debt of PRLP as of this date, considering that the property is fully develop[ed] and ready for sale and that any risk due to marketing is adequately included in the general 'discount rate' considered by the appraiser, in a deduction of 20% of the real value. See December 4, 2012 appraisal included as Exhibit 2. Upon full payment to PRLP for the realization of the equivalent of its secure[d] claim, the Debtor will be release[d] from such debt and claim in full. Under both scenarios, this class is impaired." (Docket No. 177).

"fair market value" of the individual units of the collateral to which some administrative expenses need to be discounted from the value and not the "value to a single purchaser" or "bulk value" methodology in which certain expenses and profit are deducted to reduce the fair market value considerably (Docket No. 361). PRLP also filed its *Brief on Valuation for Hearing on Confirmation of Amended Plan* arguing that the appropriate methodology that should be employed is the bulk sale value which is also known as the market value to a single purchaser which is a conservative approach to valuation of collateral that is consistent due to the risks being shifted to PRLP by Debtor's proposed surrendering of the collateral (Docket No. 362).

■ The confirmation hearings were held on April 8 and 24, 2014 in which expert testimony from three (3) appraisers was heard by the court (Docket Nos. 366 & 379). On May 19, 2014, the Debtor filed its *Proposed Findings of Facts and Memorandum of Law in Support of Confirmation of Debtor's Plan of Reorganization and Valuation of Collateral* (Docket No. 404). On the same date, PRLP also filed its *Proposed Findings of Facts and Conclusions of Law in Hearing on Confirmation* (Docket No. 405). For the reasons stated herein, the court concludes that the appropriate appraisal methodology that should be employed in this particular case is the market value to a single purchaser which was used by both Mr. Vallejo and Mr. Bonnin. This court finds that Mr. Vallejo's appraisal report is the most accurate as to the valuation of the two (2) commercial locales and that Mr. Bonnin's appraisal report is the most accurate as to the valuation of the residential units under the circumstances. This court concludes that the Debtor's proposed surrendering of the complete collateral is not the "indubi-

table equivalent" of PRLP's (entire) claim pursuant to § 1129(b)(2)(A)(iii) and thus, there is an unsecured deficiency claim on behalf of PRLP.

The main issue before the court is the confirmation of the Chapter 11 plan. The same hinges on the valuation of Debtor's assets and the timing of the valuation as these two factors will determine the extent of secured creditor PRLP's claim. The valuation will, in turn determine compliance with 11 U.S.C. § 1129(b)(2). The case has substantially centered on the litigation between the Debtor and PRLP regarding the payment of the latter's claim. The litigation is an example of the competing interest of the Debtor to retain collateral and those of the secured creditor to preserve its rights over the collateral and be paid its claim. The continuous litigation for use of cash collateral must now be subject to the finality of confirmation.

### Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(B) and (L). Venue of this proceeding is proper under 28 U.S.C. §§ 1408 and 1409.

### Procedural Background

Ponce De León 1403, Inc. filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code on September 16, 2011. The Debtor included Banco Popular de Puerto Rico (predecessor secured creditor) in its Schedule D—Creditors Holding Secured Claims—as a secured creditor of a commercial loan incurred in the year 2005 that is secured with the Metro Plaza Towers condominium apartments, which consists of 47 residential apartments, a commercial area and parking spaces which have a value of $24,189,800. The Debtor disclosed that the amount of the claim, without deducting the value of the collateral, was in the amount of $14,723,989 (Dock-

et No. 14). On October 5, 2011, a *Notice of Transfer of Claim* was filed by PRLP requesting the court to take notice that the claims of Banco Popular de Puerto Rico against the Debtor have been duly transferred to PRLP pursuant to Fed. R. Bankr. P. 3001(e)(2) (Docket No. 23). On October 27, 2011, the Debtor and PRLP filed a *Stipulation on the Use of Cash Collateral and Adequate Protection* (Docket No. 38).

On January 5, 2012, the Debtor filed a *Motion Requesting an Extension of the Exclusivity Period to Submit a Disclosure Statement and Secure the Votes to Confirm a Plan of Reorganization under 11 U.S.C. § 1121(d)(1) and Request for a Reduction in the Period to Respond to Ten (10) Days* (Docket No. 54) and the same was granted on January 11, 2012 (Docket No. 55). On January 20, 2012, PRLP filed proof of claim No. 7–1 in which it disclosed that the amount of the claim as of the filing of the bankruptcy petition was $14,496,907.24 and that the amount of the secured claim was also in the amount of $14,496,907.24. On March 12, 2012, the Debtor filed a *Second Motion Requesting an Extension of the Exclusivity Period to Submit a Disclosure Statement and Secure the Votes to Confirm a Plan of Reorganization under 11 U.S.C. § 1121(d)(1) and Request for a Reduction in the Period to Respond to Ten Days* (Docket No. 65).

On February 15, 2012, the Debtor filed a *Second Motion to Use Cash Collateral and Adequate Protection* in which both the Debtor and PRLP filed a joint stipulation in which PRLP consented to the Debtor's limited use of certain of its cash collateral to satisfy certain operating expenses (Docket No. 60). On March 13, 2012, a hearing was held in which the Court ordered as follows: "(1) [t]here being no opposition, the request for use of cash collateral and adequate protection (docket # 60) is hereby granted. (2)[The] motion to extend exclusivity period (docket # 65) is hereby granted" (Docket No. 66).

On April 13, 2012, the Debtor filed its Disclosure Statement and Plan of Reorganization (Docket Nos. 75 & 76). On June 5, 2012, PRLP filed a *Motion for Extension of Time to File Objection to Approval of Debtor's Disclosure Statement* (Docket No. 86) and the same was granted on June 7, 2012 (Docket No. 87). On June 8, 2012, PRLP filed its *Objection to Approval of Debtor's Disclosure Statement* (Docket No. 88). On June 14, 2012, the Debtor filed its *Reply to Objection to Approval of Disclosure Statement* filed by PRLP (Docket No. 95).

On June 19, 2012 a hearing was held in which the court considered the following matters (i) approval of the *Disclosure Statement* (Docket No. 75); (ii) *Motion to Supplement and Clarify Disclosure Statement and Plan, Docket No. 75 and 76* (Docket No. 82); (iii) *Objection to Approval of Debtor's Disclosure Statement* filed by PRLP 2011 Holdings (Docket No. 88) and *the Reply to Objection to Approval of Disclosure Statement filed by PRLP* (Docket No. 95); and (iv) *Motion for the Authorization of (1) the Permanent Use of Cash Collateral; and (2) Request that Hearing to Consider Use of Cash Collateral be Held on June 19, 2012* (Docket No. 90). At this hearing, the court ordered as follows:

"1. After considering the disclosure statement filed by the Debtor (dkt. # 75), as supplemented by information on tax credits (dkt. # 82), and the testimony of Ms. Barroso, the court concludes that the disclosed value of the properties pending to be sold (34 units) is adequate as the same is based on actual post-petition sales albeit with a minimal difference of 1%, and finds that there is adequate information. There-

fore, the disclosure statement, as supplemented, and clarified in open court is hereby approved. A separate order will be entered.

2. There being no opposition, the Debtor's motion requesting clarification of order (dkt. # 96) is hereby granted. The amount owed to PRLP should have stated as being $14,600,000 and not $45,000,000.

3. After considering the range of value of the properties pending to be sold ($15–$18 million), the amount of secured debt owed to PRLP ($11.5 to $11.7 million), the history of post-petition sales (13, that is, one per month), the statutory requirement that maintenance fees be paid, and the amount of critical expenses, outlined in the budget submitted by the Debtor in its motion for use of cash collateral (dkt. # 90), the court finds that payment to PRLP of 70% of the sale of individual units constitutes adequate protection. Consequently, the order authorizing the use of cash collateral (dkt. # 94) is hereby extended up to and including the date of the hearing on confirmation to be scheduled.

4. Audio record to be filed." (Docket No. 105).

On June 25, 2012, the *Order Approving Disclosure Statement* was entered by the court (Docket No. 107). On July 3, 2012, PRLP filed a *Notice of Appeal* from the two (2) Orders entered on June 19, 2012 (Docket No. 105) and on June 25, 2012 (Docket No. 107). The first Order (Docket No. 105) extended a previous Order (Docket No. 94) authorizing the use of cash collateral up to and including the date of the plan confirmation hearing. The second Order approved the Disclosure Statement (Docket Nos. 75 & 82) (Docket No. 112). On July 3, 2012, PRLP filed a motion for leave to appeal these two (2) Orders to the United States District Court

premised upon PRLP's allegations that: (i) the court erred in granting the Order extending the use of cash collateral because the Debtor failed to evince the existence of an equity cushion under the fair market value approach pursuant to 11 U.S.C. § 363(e) and (p); and (ii) the court also erred in approving the Disclosure Statement because the Debtor failed to prove that the value of the Metro Plaza properties (collateral) pursuant to the fair market value approach was in conformity (in accordance/compliance) with the provisions of 11 U.S.C. § 1125(a)(1) (Docket No. 115). The Debtor filed its opposition on July 16, 2012 arguing that the appealed Orders are interlocutory Orders and that PRLP's request for appeal does not comply with the necessary requirements to grant this request (Docket No. 121). The District Court acknowledged PRLP's appeal on July 23, 2012 (Docket No. 128). The District Court on October 2, 2012 granted PRLP's leave to appeal (Case No. 12–01577(JAF), Docket No. 8).

On October 25, 2012, PRLP filed an *Urgent Motion for Stay Pending Appeal* (Docket No. 144). On November 20, 2012, the court in its *Opinion and Order* denied PRLP's stay pending appeal because it found that PRLP failed to establish a likelihood to succeed on the merits or show irreparable harm. The court did not find public policy to be an issue at this juncture (Docket No. 150). On December 4, 2012, PRLP filed a *Motion for Reconsideration of Order Denying Urgent Motion for Stay Pending Appeal* arguing that the court should vacate and reverse its November 20, 2012 Order because the court relied on alleged "uncontested valuations" of the Metro Plaza property for which no evidence was presented or proffered by the Debtor (Docket No. 154). The court denied PRLP's motion for reconsideration on December 13, 2012 (Docket No. 160). On

June 18, 2012, the Debtor filed a *Motion in Compliance with 11 U.S.C. § 1129 Requirements for Confirmation* (Docket No. 164).

On December 19, 2012, PRLP filed its *Objection to Confirmation of Plan of Reorganization (dated April 13, 2012) as Supplemented (on May 8, 2012) (Docket Nos. 76 and 82)* premised upon the following: (i) Debtor's proposed scenario A which is to pay PRLP's allowed secured claim through the partial transfer of PRLP's collateral fails to comply with the indubitable equivalent requirements of 11 U.S.C. § 1129(b)(2)(A)(iii); (ii) the plan is not feasible under all three (3) proposed scenarios [2] and does not comply with the requirements of 11 U.S.C. § 1129(a)(11); (iii) the plan as filed has not been proposed in good faith pursuant to 11 U.S.C. § 1129(a)(3); (iv) the three (3) scenarios proposed under the plan fail to comply with 11 U.S.C. § 1129(a)(7) because PRLP will receive more in a Chapter 7 liquidation based upon the project's current value as per the Appraisal Report; (v) the plan does not provide for PRLP's collection of its deficiency claim (resulting from the current value of the Metro Plaza property as reflected in the Appraisal Report) in the unsecured creditors class in violation of 11 U.S.C. §§ 1122, 1123 and 1129(a)(10); and (vi) the plan is premised on a Disclosure Statement that contains erroneous information and if the Debtor intends to file a supplement to the plan, the Disclosure Statement should be amended and re-circulated to creditors (Docket No. 165).

On December 27, 2012, a confirmation hearing was held in which the court determined the following: "[t]he confirmation hearing is continued to 02/20/2013 at 9:30am. Debtor is to give notice. Debtor shall file an amended Chapter 11 plan on or before 01/25/13, and give 14 days' notice for objections. Debtor and PRLP Holdings LLC agree to modify the percentage of payments from 70% to 87% for all sales up to confirmation." (Docket No. 174). On January 25, 2013, the Debtor filed its *Amended Plan of Reorganization Dated January 25, 2013* (Docket No. 177). On January 28, 2013, the Debtor filed a Supplement to its Amended Plan of Reorganization to include a release and a "bad boy clause" under proposed scenario A for the payment to secured creditor PRLP (Docket No. 181). The Debtor withdrew the *Supplement to its Amended Plan of Reorganization* (Docket No. 181) on February 20, 2013 and the court granted the Debtor's request (Docket No. 206). On Febru-

---

2. The three (3) scenarios proposed by Debtor in its plan of reorganization dated April 13, 2012 are the following:

"**Scenario A:** The Debtor shall surrender a set number of units to PRLP that is the indubitable equivalent of the Debtor's outstanding obligation on the Effective Date. After satisfying the obligation to PRLP by surrendering property that is the indubitable equivalent of the obligation, all remaining units shall remain with the Debtor and shall be administered by the Debtor to fund its Plan of Reorganization.

**Scenario B:** In agreement with PRLP and QB Construction Inc., for the management and sale of the units, the Debtor shall continue administering and selling units for the benefit of PRLP and provide payment in full of the amounts owed to PRLP within a term of thirty-six (36) months by apportioning a certain percentage of the proceeds from each sale to PRLP. Interest on the outstanding obligation shall accumulate at the same rate agreed pursuant to the original terms and conditions of the loan agreement.

**Scenario C:** Subject to availability of secured financing, the Debtor shall arrange or request a third party to purchase the mortgage note from PRLP in an amount equal to 50% of the outstanding obligation on the Effective Date. Payment of this amount shall be made within ninety (90) days from the signature of the asset purchase agreement. All three scenarios described for treating the claims of this class are impaired." (Docket No. 76).

ary 11, 2013, the Debtor filed a *Motion in Compliance with 11 U.S.C. § 1129 Requirements for Confirmation* (Docket No. 192).

On February 11, 2013, PRLP filed its *Objection to Confirmation of Amended Plan of Reorganization* (Docket No. 177) premised upon the following alleged deficiencies of the amended plan pursuant to 11 U.S.C. § 1129: (i) given that Debtor has not been able to reach an agreement with PRLP to date, PRLP assumes that plan confirmation will be sought under scenario B which proposes that Debtor will surrender to PRLP the Metro Plaza Property as the indubitable equivalent "sufficient to cover the entire debt of PRLP as of this date." PRLP objects to proposed scenario B of the amended plan based upon the following: (a) Debtor will not be able to pay PRLP's allowed secured claim in full (PRLP's allowed secured claim amounts to $10,066,548.17) with the turnover of the project based upon Mr. Vallejo's Appraisal Report which appraised the residential and commercial units using a present discounted market value and/or value to a single purchaser of $7.9 million in addition to the parking garage which was appraised at a market value of $1.5 million, for a total value of $9.4 million for the project; and (b) assuming the market value of the project is correct under the Appraisal Report, PRLP would be left with a resulting deficiency claim of approximately $1,109,045.77 which has not been classified or treated under the General Unsecured Class (Class 3). PRLP's objections applicable to both scenarios are the following: (i) the amended plan is not feasible because it fails to comply with 11 U.S.C. § 1129(a)(11), in particular scenario B proposes to pay Class 3 (General Unsecured Creditors) through a capital contribution made by the shareholders of the Debtor. However, the Disclosure Statement does not provide any information as to the shareholders' liquidity or financial capacity to make the required capital contribution; (ii) the Debtor's alleged full payment to Class 3 is speculative because it failed to account for PRLP's $1,109,045.77 deficiency claim; (iii) Debtor does not disclose in the amended plan or the Disclosure Statement how it expects to fund the full payment to Administrative Claims creditors (Class 1) when considering that Debtor's cash on hand is fully encumbered to PRLP, and as of December 31, 2012 was estimated in the amount of $233,678.96; (iv) Debtor's amended plan fails to satisfy 11 U.S.C. §§ 1122(a) and 1123(a)(4) because it improperly and unreasonably created a new Class 4 to segregate and separate QB Construction, Inc. ("QB") from Class 3 (General Unsecured Creditors) to gerrymander claims to create an impaired accepting class and satisfy part of the requirements under section 1129(b); (v) given that PRLP's deficiency claim must form part of Class 3 (General Unsecured Claims) and the same may be sufficient to control Class 3 pursuant to section 1126(c), it appears Class 4 was created for the purpose of obtaining at least one impaired accepting class for "cramdown" purposes under 11 U.S.C. § 1129(a)(10); (vi) the amended plan as filed has not been proposed in good faith pursuant to 11 U.S.C. § 1129(a)(3) because it lacks a reasonable probability of meeting the statutory requirements of confirmation and thus, does not comply with the good faith requirement under 11 U.S.C. § 1129(a)(3); and (vii) PRLP will not receive more under the amended plan than under a hypothetical liquidation scenario pursuant to section 1129(a)(7) (Docket No. 194).

On February 11, 2013, PRLP filed a *Motion Regarding Adequacy of Disclosure Statement in View of Recent Amendments to Plan* arguing that an Order should be entered requiring the Debtor to

file an amended Disclosure Statement pursuant to 11 U.S.C. §§ 1125(b) and 1127(c) based upon the following: (i) the segregation of QB into a separate class with a separate treatment must be explained in detail; (ii) the amended plan incorporates the Metro Plaza property values as of December 4, 2012 Appraisal Report. As a result of these updated values, the original Plan's distribution scheme to creditors, cash flow statements, projections and liquidation analysis have been greatly changed in the amended plan; (iii) under scenario B of the amended plan, the Debtor proposes to pay Class 3 in full through a capital contribution made by the Debtor's shareholders. This alternate treatment to unsecured creditors was not included in the original plan. PRLP further argues that Disclosure Statement does not provide any information regarding the shareholders' liquidity or financial capacity to make the required capital contribution within the time frame contemplated in the amended plan; (iv) as to the Administrative Claims (Class 1) Debtor does not disclose in the amended plan or the Disclosure Statement how it expects to fund the full payment to administrative claims; and (v) according to the amended plan, one of the proposed sources of funding is through the sale of tax credits. However no information as to its status has been provided in the Disclosure Statement (Docket No. 195). On February 13, 2013, the Debtor filed its *Response to PRLP's Motion Regarding Adequacy of Disclosure Statement* arguing that there is no need to submit an amended Disclosure statement due to the following: (i) the Appraisal Report was previously submitted by the Debtor to PRLP through the discovery made and to the creditors through the exhibits to the amended plan; (ii) PRLP and all creditors received adequate disclosure to make an informed decision regarding the amended plan of reorganization;

(iii) Debtor amended its plan to provide treatment to PRLP's claim in conformity with the new appraisal report prepared by Mr. Vallejo and to satisfy the objections originally raised by PRLP in its objection to confirmation; (iv) the Debtor concedes that it included a new class (Class 4) in the amended plan which consists of only one unsecured creditor, QB which was originally included under Class 3 (General Unsecured Creditors). QB voluntarily chose to defer the payment of its claim until all other creditors were paid, thus the Debtor classified their claim separately. This amendment benefits unsecured creditors in Class 3 and does not prejudice PRLP because payment to all junior classes has always been proposed after PRLP is paid in full; (v) the Debtor has obtained accepting votes under Class 3 and QB construction has also accepted the plan. Thus, the Debtor does not need to file an amended Disclosure Statement because QB construction has accepted the plan; (vi) PPvLP's argument that it would have the controlling vote under Class 3 if it was allowed a deficiency claim in the amount of $1.1 million is misplaced because if QB were a creditor under Class 3, it would be the Debtor's largest unsecured creditor (QB has a claim in the amount of $3,270,383) which exceeds PPvLP's alleged deficiency claim. All other creditors under Class 3 who voted on both occasions have accepted the plan; (vii) it has been clearly established that if the modified plan materially and adversely changes the way a creditor is treated then the claim or interest holder is entitled to a new disclosure statement and another vote. In this case, both requirements have not been met. The terms of the treatment to the classes are essentially the same. The Debtor has maintained the same percentage and the term in which the payment will be made. The modification is in the mechanics in which the payment is going

to be and the source of funds; and (viii) the Debtor has provided to PRLP in its response to the production of documents served all available information with respect to the procurement of these tax credits (Docket No. 200).

On February 20, 2013, a confirmation hearing of the amended plan of reorganization dated January 25, 2013 was held in which the Debtor and PRLP proffered to have an agreement pursuant to scenario A of the Chapter 11 plan which provides that the Debtor will retain the property and PRLP will retain its liens and will receive deferred cash payments within thirty-six (36) months. The key aspects of the agreement were summarized in open court. The parties agreed to file a written stipulation within fourteen (14) days (Docket No. 206). On March 5, 2013, the Debtor filed a *Motion Requesting Short Extension of Time to Submit Stipulation* (Docket No. 213) and the court granted said motion (Docket No. 214). On March 16, 2013, the Debtor filed a Second Motion Requesting Short Extension of Time to Submit Stipulation (Docket No. 216) and the same was granted (Docket No. 217). On March 18, 2013, PRLP filed a *Motion Requesting Extension of Time to Submit Stipulation* informing the court that the parties require until March 25, 2013 to finalize negotiations and to file the stipulation (Docket No. 219). On March 19, 2013, the court granted the motion (Docket No. 220). On March 22, 2013, PRLP filed a second *Motion Requesting an Extension of Time to Submit Stipulation* requesting until April 1, 2013 to finalize negotiations and file the stipulation (Docket No. 224). The court granted PRLP's second motion requesting an extension of time (Docket No. 226). On April 1, 2013, the Debtor filed a third *Motion Requesting Extension of Time to Submit Stipulation* until April 11, 2013 for counsel for the Debtor to review and finalize the stipulation (Docket

No. 228). The court granted the Debtor's third motion for an extension of time (Docket No. 229).

On March 28, 2013, the United States District Court for the District of Puerto Rico affirmed the two (2) Orders appealed by PRLP in which the Bankruptcy Court held the following: (1) authorized the Debtor to use the cash collateral up to and including the date of the hearing on confirmation; and (2) found that the Disclosure Statement, as supplemented, provided adequate information and approved the same (Docket No. 230).

On April 30, 2013, the Debtor filed a *Motion to Request Hearing for Confirmation of Debtor's Plan* informing the court to schedule a confirmation hearing because the parties have been unable to reach an agreement regarding certain clauses of the stipulation (Docket No. 233). On May 13, 2013, an *Order and Notice* was docketed by the court scheduling a confirmation hearing for July 3, 2013 (Docket No. 236). On June 11, 2013, the Debtor filed a *Motion Requesting Continuance for Confirmation Hearing and Request for Alternate Dates* because appraiser Luis E. Vallejo will be out of Puerto Rico during the month of July and his assistance to the confirmation hearing is key since he will testify as to the value of the collateral (Docket No. 242). On June 19, 2013 the court docketed an *Order and Notice Rescheduling Confirmation Hearing* to September 18, 2013 (Docket No. 244). On September 17, 2013, the Debtor filed an *Informative Motion as to Stipulation by and between Debtor and PRLP 2011 Holdings, LLC* informing the court that an agreement has been approved as of this date by the majority of the shareholders but is missing the signature and approval of all shareholders as required by the secured creditor. Once the stipulation is approved by all the shareholders the same

will be filed with the court (Docket No. 259).

On September 18, 2013, a hearing was held in which the court stated the following "[t]he hearing is continued without a date. The plan is consensual; all classes have accepted [the] plan, including PRLP on account of agreement to be filed within 7 days. Payments to HOA detailed in par[agraph] 21 of the stipulation. Maintenance fees to be paid on the effective date of the plan. Parties granted 14 days to object to stipulation. Objection language to be included and notified to all parties in interest. Parties to move the court within 14 days after stipulation is filed." (Docket No. 260). On September 25, 2013, a *Joint Stipulation by and between Debtor and PRLP 2011 Holdings LLC* was filed to resolve outstanding issues between the parties regarding confirmation of the amended plan of reorganization and request the court's approval of the same (Docket No. 263). On October 9, 2013, the Consejo de Titulares del Condominio Metro Plaza Tower ("HOA") filed an *Objection to Stipulation filed by Debtor* (Docket No. 270). On October 28, 2013, the court entered an *Order and Notice* scheduling a hearing for January 14, 2014 to consider the joint stipulation and HOA's amended objection to the stipulation (Docket No. 272). On November 1, 2013, PRLP filed its *Response to the Homeowners Association's Objection to the Stipulation* (Docket No. 282). On November 13, 2013, the HOA filed a *Reply Memorandum to PRLP 2011 Holdings LLC's Response to the Homeowner Association's Objection to the Stipulation (Docket # 282)* (Docket No. 283). On January 13, 2014, the HOA initiated an adversary proceeding against the Debtor and PRLP seeking a declaratory judgment as to whether the maintenance fees of unsold apartment units and the curing of the deficiencies allegedly caused by the Debtor's omission to the

state law imposed constitute administrative expenses pursuant to 11 U.S.C. § 503(b)(1)(A) (Docket No. 295).

On January 14, 2014, a hearing was held to consider the joint stipulation and HOA's objection to the same. At the hearing, he Debtor informed the court that PRLP requests the HOA to withdraw the complaint it filed yesterday against PRLP with prejudice requesting PRLP to pay the maintenance fees. The Debtor also informed that there is no longer an agreement. Thus, the court ordered the Debtor to inform within 60 days if a valuation hearing is necessary or if an agreement had been reached. The hearing was continued to April 1, 2014 (Docket No. 296).

On March 11, 2014, PRLP filed a *Motion for Extension of Time* of fourteen (14) days to supplement its objections to Debtor's amended plan (Docket No. 311). PRLP's motion requesting an extension of time was granted on March 13, 2014 (Docket No. 313). On March 14, 2014, the Debtor filed a *Motion Requesting Valuation Hearing under 11 U.S.C. 506 and F.R.B.P. 3012 in Order to Proceed under Section 1129(b)(2)(A)(iii) as to PRLP* by which it informed the court of the following: (i) since there is no agreement with PRLP, Debtor has decided to surrender the totality of the property which serves as collateral to PRLP as the indubitable equivalent of its secured claim (as reduced); (ii) pursuant to the most recent certification received from PRLP as of this date, the debt amounts to $6,124,608 in principal and interest plus $197,507.21 in attorney's fees; (iii) the "market value" of the property that constitutes the collateral of PRLP exceeds the amount of the debt pursuant to Debtor's appraisal report; (iv) the Debtor will proceed with the confirmation of its amended plan under scenario B pursuant to Section 1129(b)(2)(A)(iii) surrendering "all the property" that consti-

tutes the collateral of PRLP; (v) the "market value" of the property that will be surrendered needs to be determined since the value is in controversy; and (vi) it is Debtor's position that the "market value" approach should be used in cases in which the "total property" that serves as collateral will be surrendered as the indubitable equivalent (Docket No. 314).

On March 25, 2014, PRLP filed its *Supplement to Objection to Confirmation of Amended Plan of Reorganization (Docket No. 177)* objecting to debtor's Amended Plan of Reorganization for several reasons. However, at this juncture the court will focus only on the reasons regarding the issue as to the valuation of the collateral (real estate) which consist of the following: (i) Scenario B fails to provide for the payment of PRLP's unsecured deficiency claim because Debtor will not be able to pay the entirety of PRLP's allowed claim even with the turnover of the project; (ii) the plan is not confirmable because it fails to comply with the indubitable requirements of 11 U.S.C. § 1129(b)(2)(A)(iii); (iii) surrendering the collateral does not satisfy PRLP's allowed claim, as there remains a $2,000,000 deficiency pursuant to the Appraisal Report prepared by Mr. Rafael Bonnin which concludes that the market value as of March 11, 2014 of the remaining property (the residential and commercial units) is $4,300,000; (iv) the Debtor's appraiser, Mr. Vallejo in his most recent appraisal report dated February 2014 included two (2) different conclusions of value, namely; the discounted value and the value to a single purchaser. Mr. Vallejo concluded that the discounted value of the collateral is $4,950,000. This is the Appraisal Report that the Debtor considered to propose scenario B of the amended plan: (v) the discounted present market value as explained by the Appraisal Report prepared by Mr. Bonnin and supported by Mr. Vallejo's Appraisal Reports (for the

years 2012 and 2014) is the value that is currently consistent with the applicable case law; (vi) the appropriate valuation method is the market value to a single purchaser. This valuation methodology subtracts from the aggregate retail value of the project certain costs such as: marketing, overhead, legal fees, taxes loss of loan interest and sales expenses, and other opportunity costs. Then, the resulting cash flows are then discounted to present value using an appropriate discount rate (Docket No. 327) On March 28, 2014, the Debtor filed a *Motion to Reaffirm Withdrawal of Joint Stipulation filed on September 25, 2013 (Docket No. 263)* (Docket No. 348).

On March 29, 2014, the Debtor filed its *Response to PRLP's Objections to Confirmation of Amended Plan of Reorganization dated January 25, 2013 as Supplemented (Dkts.177, 181, 194, 315, 327, 336)* arguing that the amended plan fully complies with the requirements under Section 1129(a) and (b) based upon the following: (i) this is a 100% plan plus interests to be paid at the prime rate; and (ii) the amended plan will be funded as follows: (1) the collateral to secured creditor PRLP; (2) the income from the sale of the tax credits which have been approved in the amount of $4,995,237.00 and if necessary; and (3) the plan proposes a shareholders contribution. The Debtor does not expect the shareholders' contribution because the tax credits have already been approved before the confirmation of the amended plan. The Debtor further argues that even in the worst case scenario, meaning that the court would agree with PRLP that the appropriate valuation methodology is the market value to a single purchaser or bulk sale value, it would still have sufficient funds to pay PRLP. The Debtor for illustrative purposes uses the following math computation under the worst case scenar-

io: (a) Assets: (i) valuation of collateral in bulk sale provided by Mr. Bonnin with a value of $4,300,000; (ii) tax credit proceeds in the amount of $4,995,237; (iii) total assets that amount to $9,295,237; (b) Liabilities: (i) less PRLP's alleged secured debt $6,376,980.54; (c) Net for unsecured $2,918,256.46: (i) minus HOA's claim in the amount of $1,400,000 (this amount is disputed); (ii) minus the general unsecured creditors' claims which amount to $41,065; (d) net amount of $1,477,191.46 for QB and (e) shareholders will only be paid after all superior classes have been paid in full (Docket No. 352). Moreover, the Debtor also argues that PRLP's position as to its claim being under-secured is contradictory because PRLP is claiming payment for post-petition interests in the amount of $488,949.53 and legal fees in the amount of $202,529.50 plus "other costs" in the amount of $40,411.78. Debtor sustains that PRLP's alleged unsecured claim will not amount to $2 million but it will be in the amount of $1,345,089 because under-secured claimants are not allowed post-petition, interests, attorneys' fees and costs (Docket No. 352).

On March 31, 2014, the Debtor filed its *Limited Objections to Claim No. 7 filed by PRLP* based upon a debt certification in which PRLP provides a breakdown of its claim (which is for the total amount of $6,376,980.54) which is as follows: (i) the principal owed is in the amount of $5,645,089.73; (ii) the accrued interests owed are in the amount of $488,949.53; (iii) legal fees in the amount of $202,529.50; and other costs in the amount of $40,411.78. Debtor's objection is premised upon the following arguments: (i) PRLP must comply with 11 U.S.C. § 506 which requires that PRLP prove that its claim is over-secured; (ii) show that the loan documents provide for attorneys' fees, costs, and charges; (iii) and that such fees, costs

and charges are reasonable (Docket No. 353).

On April 1 and 2, 2014, a confirmation hearing was held to consider various matters such as: (i) the joint stipulation between Debtor and PRLP; (ii) the objection to the joint stipulation filed by HOA; (iii) PRLP's response to the HOA's objection; and (iv) the bridge order granting amendment of the interim order authorizing the use of cash collateral (Docket No. 358). The court ordered that the hearing be continued to April 8, 2014 and the parties were ordered to brief the issues of appraisal methodology and applicable law as to the appraisals by April 7, 2014.

On April 7, 2014, PRLP filed an amended proof of claim # 7–2 in which it lists its claim as of the petition date in the amount of $14,496,907.24. PRLP in its proof of claim references the Annex for certain line items such as the value of property, amount of the secured claim and the amount unsecured. In the *Annex to Proof of Claim*, PRLP discloses that it filed this supplement to the claim to submit the revised amount of its claim as of March 25, 2014. PRLP states that the Debtor owes PRLP as of March 25, 2014 the total amount of $6,376,980.54 which consists of the following components: (i) $5,645,089.73 in principal; (ii) $488,949.53 in accrued interest; (iii) $202,529.50 in legal fees; and (iv) $40,411.78 in other costs (Claims Register, proof of claim # 7–2, Exhibit A). PRLP states that all proceeds received after the petition date from the sale of the real estate has been applied to principal, not to interest or fees. PRLP also discloses that the appraisal report prepared by McCloskey, Mulet & Bonnin Appraisers, P.S.C. dated March 17, 2014 concludes that the value of PRLP's collateral is $4,300,000, thus Debtor's proposed surrender of the collateral to PRLP as the "indubitable equivalent" will result in a deficien-

cy of no less than $2,076,980.54. On April 8, 2014, the Debtor filed its *Reinstated Objections to Claim No. 7–1, as Amended Last Night by PRLP and Objection to be Included as New Evidence in Trial and Request that it be stricken from the Record and that the Attorneys and Law Firm be Disqualified* (Docket No. 363).

*Parties Positions as to Valuation of Collateral Ponce de León 1403, Inc.*

On April 7, 2014, the Debtor filed its *Memorandum of Law as to the Valuation Method to be Used Under 11 U.S.C. § 506 and 11 U.S.C. § 1129(b)(2)(A)(iii) when the Complete Collateral is to be Surrendered as the Indubitable Equivalent and Applicable Appraisal Standards and Guidelines* arguing that the appropriate methodology that should be employed when the Debtor's amended plan provides for the surrendering of the entire collateral as the "indubitable equivalent" pursuant to 11 U.S.C. § 1129(b)(2)(A)(iii) is the aggregate of the "fair market value" of the individual units of the collateral to which some administrative expenses need to be discounted from the value and not the "value to a single purchaser" or "bulk value" methodology in which certain expenses and a profit component are deducted to reduce the fair market value (Docket No. 361). The Debtor in its memorandum argues as follows: (i) the value of the collateral must be determined as of confirmation date pursuant to 11 U.S.C. § 506(a). Section 506(a)(1) provides that the value "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest;" (ii) the value to a single purchaser methodology is appropriate

when the Debtor proposes to surrender as the indubitable equivalent of the secured claim only part of the collateral under a "dirt for debt" plan. The courts in "dirt for debt" [3] cases have consistently followed the application of the "bulk sale" values to guarantee the "profit" of the secured creditor's investment when receiving a portion of its collateral as the indubitable equivalent pursuant to 11 U.S.C. § 1129(b)(2)(A)(iii); (iii) if the entire collateral will be surrendered, then the appropriate methodology is the aggregate retail value of each unit that constitutes the entire collateral, thus individual appraisals must be prepared for each unit; (iv) in *In re Clarendon Holdings, LLC*, 2011 WL 5909512, Bankr. LEXIS 5313 (Bankr. E.D.N.C.2011) the court concluded that when all of the property that is subject to the creditor's collateral is being surrendered within the context of 11 U.S.C. §§ 506(a) and 1129(b)(2)(A)(iii), the appropriate value to be applied is the property's fair market value; (v) in *In re Sailboat Properties, LLC*, 2011 WL 1299301 (Bankr.E.D.N.C.2011) the court adopts a four (4) step "highest and best use" inquiry which considers the following: (1) what is the highest and best use of the collateral?; (2) what use of the collateral will yield the highest net value; (3) is the highest and best use of the collateral the use that will yield the highest net value?; and (4) is that use reasonably available to the secured creditor?; (vi) if the four prong test is applied in this case, "the current use is the highest and best use of the property subject to the collateral of PRLP is the property's current use which is also the most likely to yield the highest net value, and that the use of a professional to market the sale of the property is reasonably

---

**3.** The term "dirt for debt" is discussed below as it relates to providing the indubitable

equivalent for a secured claim.

available to PRLP as a means of disposing of the property;" (vii) the court in *In re Sailboat Properties, LLC* held that the fact that the property will be owed by the bank, does not alter the highest and best use of the property; and (viii) courts have rejected to adopt a foreclosure sale market price when the entire collateral is to be surrendered to the secured creditor (Docket No. 361).

The Debtor in its memorandum of law presented the following position as to the Uniform Standards of Professional Appraisal Practice ("USPAP"): (i) USPAP represents the generally accepted and recognized standards of appraisal practice in the United States. USPAP provides a minimum set of quality control standards for the conduct of appraisal in the United States, but it does not prescribe specific methods to be used. Rather "... USPAP simply requires that appraisers be familiar with and correctly utilize those methods which would be acceptable to other appraisers familiar with the assignment at hand and acceptable to the intended users of the appraisal." This particular standard is the scope of work rule; (ii) USPAP does not preclude the appraiser from presenting the appraisals of the individual units without having to perform a discounted cash flow analysis to reach the bulk value; (iii) "PRLP claims that the [d]iscounted [c]ash [f]llow analysis was required in this case because the project is a track land development that has more than five (5) unsold units that are constructed as a single development. This conclusion is based [o]n a citation from the Interagency Appraisal and Evaluation Guidelines and is applicable and misleading. The Interagency Appraisal and Evaluation Guidelines are applicable when a financial institution, subject to the FIRREA provisions and other federal banking regulations is going to finance a track of land development. This is not the case before

the court. Compliance with the discounted cash flow analysis is not required in this specific case;" and (iv) the proper analysis is the individual market value of the remaining units with the deduction of the applicable operating expenses or holding costs (Docket No. 361).

Subsequent to the confirmation and valuation hearings, the Debtor filed its *Proposed Findings of Facts and Memorandum of Law in Support of Confirmation of Debtor's Plan of Reorganization and Valuation of Collateral* (Docket No. 404). As to the findings of fact regarding the valuation hearing, the court has included herein the testimonies of the three (3) appraisers from which it will derive its own findings of facts which are crucial to determining the appropriate appraisal methodology and the value of the subject property.

As stated before, at this juncture, the court will only focus on the legal valuation arguments that were not included in the parties' previous memoranda since the other confirmation issues will be affected by the ultimate resolution of the valuation issue. The Debtor's additional valuation arguments brought forth in its memorandum were the following: (i) "[a]s to PRLP's alleged deficiency claim, it has been determined by certain courts that when the collateral is itself surrendered there is no right to a deficiency claim. *See In re Western Real Estate Fund, Inc.,* 109 B.R. 455 (Bankr.W.D.Okla.1990); ("a [c]reditor to which a Chapter 11 debtor proposed to transfer its collateral property was not entitled to unsecured claim in the amount by which its total claim exceeded value of the collateral property"); (ii) in *In re Sandy Ridge Development Corporation,* 881 F.2d 1346 (5th Cir.1989), two (2) axiomatic rules were established as a guideline to determine the indubitable equivalent of a secured creditor's claim when the Debtor

proposed to surrender the collateral; namely: (1) "[t]he valuation of the assets of a debtor in bankruptcy is an integral part of the confirmation process under Chapter 11" and (2) "[t]he transfer on plan approval of all its collateral to a secured creditor, at a value properly fixed by the bankruptcy court, gives that creditor the indubitable equivalent of its secured claim;" (iii) "case law establishes a four (4) tier test to prove the indubitable equivalent: (a) [t]he ability of the Debtor to deed back real estate in satisfaction of the claim (in other words surrender the property); (b) [t]he ability of the Court to place a value on the property for indubitable equivalent purposes. Under 11 U.S.C. § 506 the Court can value the property at confirmation date and does not need to base the value of the collateral on its foreclosure value or at the time the secured creditor disposes of the property; (c) [t]he risk placed upon the creditor by being forced to accept the property in satisfaction of the claim. The Court will adjust the appraiser's value in view of the inherent risks. This does not mean that the Court has to provide a liquidation value or a safety net for the loss. The Court will therefore discount the reasonable expenses and a discount rate; and (d) [t]he actual treatment received by the creditor under the Plan;" (Docket No. 404, pg. 37); and (iv) "[f]or confirmation purposes it may be possible that under these circumstances a discount to the "fair market value" of the collateral be allowed in order to compensate the creditor the costs and delays associated with liquidating the collateral" *In re Immanuel LLC*, 2011 WL 938410, 2011 Bankr. Lexis 1015 (Bankr.W.D.Mich.2011); (v) "[t]he deep discount applied to the collateral when the "Market Value to a Single Purchaser" or "bulk value" is applied, is generally used when debtors propose plans which only surrender part of the collateral or "dirt for debt" plans. That is, when the

debtor proposes to make a partial return of the collateral in full satisfaction of the secured claim, based on the appraised value. *See* page 11 of PRLP's Supplement citing *Centennial Park, LLC,* 2011 WL 5520968 (Bankr.D.Kan.2011), *In re Bannerman Holdings, LLC,* 2010 WL 4260003 (Bankr.E.D.N.C.2010), *In re Fazekas,* Case No. 92–02262–8JRL (Bankr.E.D.N.C. 1993), *In re Clarendon Holdings, LLC,* 2011 WL 5909512 (Bankr.E.D.N.C.2011), *In re Sailboat Properties, LLC,* 2011 WL 1299301 (Bankr.E.D.N.C.2011);" and (vi) the court shall not deduct the profit component in any scenario and under any of the valuations presented in evidence because it is not mandatory and inappropriate according to the facts of this case. "As in *Sailboat* we conclude that the inclusion of a profit component is inappropriate in this case when the project is completed and 91% sold. The case law includes that the profit component is used if the property's highest and best use is to be sold in bulk lots, not individual sales. The risk is borne by the secured creditor and any discount on account of their choice to dispose of the property must not interfere with a determination of the highest and best use of the property for valuation purposes." (Docket No. 404).

*PRLP*

On April 7, 2014, PRLP filed its *Brief on Valuation for Hearing on Confirmation of Amended Plan* arguing that since the Debtor plans to surrender the collateral to PRLP a conservative approach in valuation is appropriate due to the following: (i) the Debtor is shifting the risk of loss to the secured creditor; (ii) the secured creditor will not be earning any interest on its secured claim until the collateral is sold; and (iii) valuation is an inexact science. PRLP further argues that of the three (3) appraisal reports before the court, two (2) appraisals submitted by PRLP and by the

Debtor follow the same methodology; namely, the discounted market rate to a single purchaser. This methodology was followed by Mr. Luis' E. Vallejo as the court approved appraiser for the Debtor and by Mr. Rafael Bonnin as PRLP's appraiser. Both appraisers concluded in their appraisal reports that PRLP is an under secured creditor for purposes of the indubitable equivalent. The third appraisal by Mr. Gaztambide "appears to have been made-to-order by the Debtor, as it disregards the methodology and professional standards applicable to rendering a conclusion of value (Docket No. 362).

PRLP in its brief explains in detail the applicable USPAP standards, guidelines and rules that should be applied in the valuation of the collateral. The first rule PRLP discusses is the Scope of Work rule which states: "For each appraisal and appraisal review assignment, an appraiser must: 1–identify the problem to be solved; 2. Determine and perform the scope of work necessary to develop credible assignment results; and 3. Disclose the scope of work in the report." [4] The appraiser to properly identify the appraisal problem to be solved must identify the following elements: (i) client and any other intended users; (ii) intended use of the appraiser's opinions and conclusions; (iii) type and definition of value; (iv) effective date of the appraiser's opinions and conclusions; (v) subject of the assignment and its relevant characteristics; and (vi) assignment conditions. *See* USPAP 2014–2015, pg. U–13.

In applying the Scope of Work rule in the instant case, the appraiser must consider the following: (i) the subject property is a single property that consists of a group of 15 residential and 2 commercial units in a completed condominium; (ii) the intended use of the report is a bankruptcy proceeding in which the Debtor's amended plan proposes to surrender the subject property as the "indubitable equivalent;" (iii) the type of value being sought is market value of the subject property in "as is" condition as of the effective date of value; (iv) market value is to be estimated in cash; and (v) the appraisal methodology must consider the above property characteristics and assignment conditions. The definition of market value as defined in The Appraisal of Real Estate, 13th edition, published by The Appraisal Institute in the year 2008 is as follows: "[t]he most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under duress."

PRLP next discusses the "highest and best use" standard which is defined as: "[h]ighest and best use is the reasonably probable and legal use of vacant land or an improved property that is legally permissible, appropriately supported, financially feasible, and that results in the highest value." PRLP fails to disclose the source of this definition in their motion.[5] The

---

4. PRLP attaches to its brief various Exhibits, but fails to include the specific citations throughout its brief. PRLP cites the 2014–2015 Uniform Standards of Professional Appraisal Practice (USPAP), pg. U–13, The Appraisal Foundation.

5. PRLP references Standards Rule 1–3(b) regarding the highest and best use definition. However, the 2014–2015 USPAP Standards Rule 1–3(b) does not define the highest and best use, but it discusses this concept under Standard 1: Real Property Appraisal, Development. Standards Rule 1–3 states the following: "[w]hen necessary for credible as-

court notes that Mr. Bonnin in his Appraisal Report under the Highest and Best Use Analysis includes the definition of highest and best use as defined by the *Dictionary of Real Estate Appraisal,* Fifth Edition published by the Appraisal Institute as:

"[t]he reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum profitability."

Mr. Bonnin concludes that the highest and best use for the subject property components is "the continuation of the existing residential and commercial uses. For the residential components, this would be at prices that generate adequate absorption.

For the commercial component, this would be at prices that stimulate a sale, or rent levels that stimulate their leasing."[6]

To support its position regarding the appropriate appraisal methodology, PRLP cites in its brief references to USPAP Advisory Opinion 23 (AO–23), which provides advice from the Appraisal Standards Board ("ASB") regarding appraisal problems and issues in determining which characteristics of a real property are relevant to its appraisal. AO–23 addresses the appraisal issue of a client that finances a real estate development project for use in a single-family residential tract development financing package and requests an opinion as to the value for the project. This example involves five properties which consist of the project plus four (4) floor plans. The project in this example involves finished sites and construction and sale of finished homes over a period of years.

signment results in developing a market value opinion, an appraiser must:

(a) identify and analyze the effect on use and value of existing land use regulations, reasonably probable modifications of such land use regulations, economic supply and demand, the physical adaptability of the real estate, and market area trends; and

*Comment:* An appraiser must avoid making an unsupported assumption or premise about market area trends, effective age, and remaining life.

(b) Develop an opinion of the highest and best use of the real estate.

*Comment:* An appraiser must analyze the relevant legal, physical, and economic factors to the extent necessary to support the appraiser's highest and best use conclusion(s)." (2014–2015 USPAP, pgs. U–18 & U–19).

6. The court notes that Mr. Bonnin's Appraisal Report dated March 17, 2014, under the Highest and Best Use Analysis section, Mr. Bonnin's complete highest and best use analysis as to the subject property is the following:

"[t]he subject project is currently completed in construction. It was designed as a mixed-use project, with a residential component of 174 apartment units, a commercial component of two (2) commercial ground floor locales, and a public parking garage. Of the 174 residential units, 159 or 91% have been sold. Changing the use of the remaining 15 subject residential units to any use other than the allowed residential would therefore not be legally permissible. The same occurs with the commercial locales. These uses are physically possible. As will be demonstrated in the valuation sections to follow, the real estate market for residential and commercial uses [in] this location has deteriorated in the past several years, resulting in price and rent reductions and increased vacancy Based on the foregoing, we conclude that the highest and best use of the subject property components is the continuation of the existing residential and commercial uses. For the residential components, this would be at prices that generate adequate protection. For the commercial component, this would be at prices that stimulate a sale, or rent levels that stimulate their leasing." (Claims Register, proof of claim # 7–2, Exhibit B, pg. 43). Appraisal Report was admitted into evidence at April 8, 2014 hearing.

The values are market value and the effective date of value is at a current date. The intended use is for securing the development loan and the take-out loan commitment. The opinion distinguishes the focus of the appraisal based upon the type of financing being requested. "For the development loan, the subject's relevant characteristics are those of the project, not the homes, and the scope of work to analyze the market for the project must address the entire project's characteristics. For each take-out-loan, the relevant subject property is an individual finished home, not the project, and the summation of the value for those individual homes is not meaningful in terms of the value of the project. Indeed, summation of the value of the individual homes to indicate the market value of the project is incorrect development, and reporting such a summation as market value of the project is misleading. The scope of work necessary to analyze the market for an individual home as a subject property is significantly different from that necessary to analyze the market for the project as a subject property." *See USPAP Advisory Opinions* 2014–2015 Edition, pg. A–83.

PRLP, without explaining the similarities and/or differences between the subject property in the example and the Debtor's subject property, concludes as follows:

"The preceding example, as applied for the subject property, means that there [are] 18 properties in the subject assignment: the subject group of properties which are subject to a single loan, plus each of the 17 individual condominium units. And as stated in the example, summation of the value of the individual units to indicate the market value of the project (in this case the 17 unsold units at the project) would be incorrect development, and reporting such summation as the market value of the project is

misleading and unreliable." (Docket No. 362, pg. 9)

PRLP also incorporates USPAP Advisory Opinion 30 (AO–30) in its valuation brief which addresses the issue of the appraiser's obligations when performing a real property appraisal for use by a federally regulated financial institution. PRLP argues that the Interagency Appraisal and Evaluation Guidelines were developed to assure sound lending practices and the same provide guidance as to the correct methodology for appraising the subject property. PRLP cites the Interagency Appraisal and Evaluation Guidelines—2010 to support its position that the real estate property that constitutes its collateral must be valued under the bulk sale value methodology also known as the market value to a single purchaser. PRLP argues that pursuant to the Interagency Appraisal and Evaluation Guideline an appraiser must, among other things "[a]nalyze and report appropriate deductions and discounts for proposed construction or renovation, partially leased buildings, non-market lease terms, and tract developments with unsold units." (Interagency Appraisal and Evaluation Guidelines, pg. 8).

PRLP in its brief argues that the real estate project (or its real estate collateral) fits the definition of a tract development project within a condominium which has more than five (5) unsold units pursuant to the Interagency Appraisal and Evaluation Guidelines, and as such certain deductions and discounts must be accounted in the appraisals to obtain market value. A tract development is defined as: "a project of five units or more that is constructed or is to be constructed as a single development. For purposes of these Guidelines, 'unit' refers to: a residential or commercial building lot, a detached single-family home, an attached single-family home, and a residence in a condominium, cooperative,

or timeshare building." *See* Interagency Appraisal and Evaluation Guidelines, Appendix D, pg. 44. "Appraisals for these properties must reflect deductions and discounts for holding costs, marketing costs, and entrepreneurial profit supported by market data. In some cases entrepreneurial profit may be included in the discount rate." *See* Interagency Appraisal and Evaluation Guidelines, Appendix C, pg. 37. In appraising condominiums with unsold units the Guidelines provide:

"For proposed construction and sale of a condominium building with five or more units, the appraisal must reflect appropriate deductions and discounts. Appropriate deductions and discounts should include holding costs, marketing costs, and entrepreneurial profit during the sales absorption period of the completed units. If an institution finances construction of a single condominium building with less than five units or a condominium project with multiple buildings with less than five units per building, the institution may rely on appraisals of the individual units if the institution can demonstrate through an independently obtained feasibility study or market analysis that all units collateralizing the loan can be constructed and sold within 12 months. However, the transaction should be supported by an appraisal that analyzes and reports appropriate deductions and discounts if any of the individual units are not completed and sold within the 12–month time frame." *See* Interagency Appraisal and Evaluation Guidelines Appendix C, pg. 38.

Thus, PRLP argues that since the subject property has more than 5 units with an estimated absorption period of 18 months the appraisal of the subject property must reflect deductions and discounts for holding costs, marketing costs, and entrepreneurial profit supported by market data.

PRLP also includes certain terms such as: bulk value scenario and sum of the retail values to distinguish the same and their application within the appraisal methodology. PRLP references a book titled *Subdivision Valuation* published by the Appraisal Institute in 2008 and authored by Don M. Emerson, Jr., MAI, SRA. PRLP states as follows regarding Bulk Value Scenario:

"The valuation scenario employed in the subdivision valuation and other valuation problems in which a group of properties are evaluated under a bulk sale scenario. This valuation scenario has as its premise the valuation of a group of lots or units to one purchaser; it is a market value estimate that recognized a specific valuation scenario that is based on the presumption of a transaction where a group of lots are to be sold to one purchaser as one sales transaction. [T]he value estimate must reflect this bulk sale scenario and recognize that the only way the purchaser can earn a profit on the investment is to eventually sell lots or units over time to eventual end users.

The bulk sale scenario considers the absorption period needed to market the lot inventory over time with appropriate deductions and discounts for holding and sales costs as well as a profit. This analysis assumes that time is of the essence and that lot or unit inventory will be made available for sale to match available market demand and at market supported retail lot or unit values."

PRLP states the following as to the Sum of the Retail Values:

"The aggregate of the individual retail prices of a group of lots or units typically sold over a holding or absorption period. Historically, the sum of the retail value has also been known as gross re-

tail value, aggregate of retail values, gross sell out, gross sell-out value, or gross retail value."[7]

As to the applicable law, PRLP argues that 11 U.S.C. § 506(a) dictates that valuation of the creditor's interest must be based on the purpose of the valuation and proposed disposition or use of such property, which in this case is that the Debtor is proposing to surrender all the property that constitutes PRLP's collateral. PRLP further argues that a conservative approach to valuation must be employed because of the risks being shifted to PRLP upon surrender of the collateral such as: (i) the risk of any loss in the value of the real property; (ii) PRLP will receive no interest until it can sell the property; (iii) the Court's determination of the value of the real property is very inexact (Docket No. 362, pg. 18). PRLP also argues that the bar for finding the indubitable equivalence is exceedingly high and as such the Debtor must prove the indubitable equivalence akin to a clear and convincing standard. Thus, for a court to make a finding that a creditor has received the indubitable equivalence of its secured claim there must be "no doubt that the secured creditor receives consideration equal to its claim in value or amount" *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 326 (3rd Cir.2010). PRLP argues that courts have held there is a multi-step process to determine the value of property the Debtor intends to surrender which consists of the following: (i) the first step in valuing the collateral is to determine the present market value of the individual units based upon the sales comparison approach; (ii) the second step is to estimate the yearly cash flow generated from the unit sales along with an appropriate absorption rate; (iii) the third step is to subtract the estimated expenses form cash flows; and (iv)

the last step is to discount to present value the estimated net cash flow *See In re Centennial Park, LLC*, 2011 WL 5520968, *3 (Bankr.D.Kan.2011) (Docket No. 362, pgs. 19–20). Both the Bonnin and the Vallejo appraisals employed this valuation methodology.

*The Hearing*

On April 8, 2014 a valuation hearing was held in which appraisers Mr. Carlos Gaztambide Acosta, Mr. Luis E. Vallejo Romeu and Mr. Rafael G. Bonnin Suris testified under oath. The court after hearing the experts' testimonies determined that: "... the proper valuation methodology for the properties to be surrendered to PRLP Holdings is the discounted market value to a single purchaser or bulk sale value. Key factors for the conclusion are: proposed plan provides for the surrender of all unsold units to PRLP, appraisal by Mr. Gaztambide was done in response to the request by Mr. Paul Lavergne to determine the value of the individual units, that sales comparison approach was used for residential units and income approach for commercial units, that there is an active market to sell individual units, that the highest and best use is to sell units individually that he would not consider (as owner) to sell units in bulk, that the list of asking prices in Exhibit D–5B is not the market value but the owner's decision, and that he was not aware at the time he made the appraisal, that the plan provided for bulk surrender." The hearing was continued to and held on April 24, 2014. (Docket No. 366). On May 19, 2014, PRLP filed its *Proposed Findings of Facts and Conclusions of Law on Hearing on Confirmation* (Docket No. 405) which includes the same arguments as its prior memorandum regarding the applicable law as to valuation and as to the applicable appraisal method-

---

**7.** The court could not find the statement made by PRLP in the cited source document.

ology that should be used in this particular case.

*Expert Testimonies of Real Estate Appraisers at the Valuation Hearing Mr. Carlos Gaztambide—Real Estate Appraiser*

Mr. Carlos Enrique Gaztambide Acosta, real estate appraiser, MAI (Member of the Appraisal Institute), testified that in his 43–44 years of experience as a real estate appraiser he has had vast experience appraising multi-use properties like the Debtor's project. Mr. Gaztambide stated that he has been an expert witness in valuation court proceedings since 1974 He stated that Mr. Paul Lavergne requested that he estimate the market value for each individual unit. The subject property consisted of 15 residential units and 2 commercial units (Exhibit C–23). Mr. Gaztambide testified that as part of the appraisal process (which culminated in his appraisal report—Exhibit 29) he visited and inspected the subject property with his associate Mr. Carlos Sosa who is also a licensed professional appraiser. They discussed the conditions of each property. Mr. Sosa selected a number of comparables which we re-discussed. Then, the third step was to prepare the analysis. These three (3) steps occur after the identification of the problem and asserting the relevance of certain facts and market activity. Mr. Gaztambide testified that as part of the appraisal process he reviewed certain documents such as: (i) the legal description of the units; (ii) the field information; (iii) certain documents that Mr. Sosa provided to him to complete the research; and (iv) documents related to market activity. Mr. Gaztambide stated that he is familiar with the Uniform Standards of Professional Appraisal Practice and that these standards have to do with the constraints by which an appraisal must be judged to ensure that the appraisal is not misleading. He testified that his appraisal (Exhibit 29) complies with the standard rules in view of the assignment, and that there are also some regulations which permit the appraiser to be more specific and avoid inadequately supported conclusions. He concluded that the Interagency Appraisal and Evaluation Guidelines do not impose the discounting analysis to the appraiser for this type of situation. Mr. Gaztambide stated that his client requested him to appraise 15 residential units and 2 commercial units. He used a number of comparables in the subject building and used them to analyze and conclude a value for each individual unit Subdivision valuation was written for proposed tract development which is usually for residential development (urbanizations). Our subject property is not a proposed condominium, but an existing one in which there are 15 unsold units out of 174 units. Mr. Gaztambide stated that a proposed tract development does not compare with the subject property that was appraised.

Mr. Gaztambide stated that his appraisal report complies with the standards and regulations because the appraiser must abide by the assignment which was to appraise 15 residential units and 2 commercial units. The appraisal report also complies with any assumptions (points of relevance) that need to be taken into account in an appraisal of this nature. Mr. Gaztambide stated that his appraisal complies with the scope of what the client ordered and the same was prepared under the disposition of the appraisal standards and guidelines.

Mr. Gaztambide explained that the residential units were valued by the sales comparison approach and the commercial component was appraised by the income approach. He stated that the highest and best use of the property is to market and

sell them independently because the building has an active market under Puerto Rico's economic reality. He recommends that the properties be marketed independently. He stated that the bulk sale analysis (applying a discount rate) is unacceptable for the owner because it would affect negatively the final realization of those properties to cash. Mr. Gaztambide concluded that the absorption rate for this project is one unit every other month. He stated that there are 4 types of units maybe 5 types. He also stated that the regular units (1400 square feet units) may be sold within a 12 month time frame. However, the large penthouse units will take longer to sell than the typical size units. Mr. Gaztambide stated that the units that take longer than 12 months to sell require a discount for the period exceeding one year.

Mr. Gaztambide discussed the appraisal of unit # 1511 (Exhibit 29(a)) to illustrate the appraisal methodology that he used for the 15 residential units. He explained that he used the standard Form 1073 which is for individual condominium unit appraisal report, although there is another form for an individual condominium unit appraisal report in which financing is involved He testified that the comparable sales that were used for unit # 1511 were recent sales that took place in the Metro Plaza condominium. The first comparable sale took place on February 2014 and the other (2) comparable sales occurred on October 2013. The first adjustment is a negative adjustment for a sales incentive in the amount of $15,000 because when these three (3) comparable properties were first sold there was a sales incentive for this amount. The other adjustment is a positive adjustment for $2,000 because the comparable sales were inferior to the subject property (unit # 1511) since the subject property was improved. An appliance incentive was not considered because both the comparable sales and the subject did not have an appliance incentive. He stated that his final conclusion of value for unit # 1511 was $275,000 and this value is consistent with the market.

Next, Mr. Gaztambide discussed the appraisal methodology used for the (2) commercial properties under the income approach. The first factor that must be determined is the market rent for this commercial unit (Ponce de León) which was assigned a market rent of $14 per square foot (7,274.71 sq. ft. area of unit) because it has frontage and exposure to Ponce de León Avenue. The second commercial unit was assigned a market rent of $10 per square foot (6,540.36 sq. ft. area of unit) because it has frontage and exposure to Ribot Street. Mr. Gaztambide explained that for the Ponce de León commercial unit he deducted a 5% vacancy and collection allowance loss. In the case of the Ribot commercial unit which will take longer to lease a 10% vacancy and collection allowance loss was used. In the case of the Ponce de León unit the effective gross income was $96,900 and for the Ribot unit the effective gross income was $58,900. The first three (3) operating expenses which have to be considered are the taxes, insurance and utilities which are paid by the tenant. For the maintenance and reserves expense a unitary amount $.10/per square foot was used because the person that acquires the unit will provide for tenant improvements, thus the owner will be primarily responsible for the structural soundness of the building. Mr. Gaztambide stated that he used 3% of EGI (Effective Gross Income) for commissions and management and for legal, audit and miscellaneous a fixed amount of $3,000 was used. He stated that for the Ponce de León unit based upon a one year of net operating income at a 10% capitaliza-

tion rate the value was $900,000. In the case of the Ribot unit after subtracting the operating expenses, the first year net operating income was $53,400 and using a 10% discount rate, the value obtained was $534,000 which is considerably less compared to the Ponce de León commercial unit. Mr. Gaztambide testified that in the letter of intent (Exhibit D–17) there was an offer for $1,000,000 for the Ponce de León commercial unit which supports his conclusion of value.

Mr. Gaztambide stated that he had seen the document (Exhibit D–5(b)) which detailed the unit prices dated February 10, 2014 after completing the appraisal report. However, Mr. Gaztambide testified that this list price would have no bearing on his opinion because the price that an owner decides he wants for his unit could be a disposition value that is usually below market value. The list prices are suggested prices whereas the comparables in the report are actual closings, comparable sales and thus, have more weight than the list (asking) prices.

Upon cross-examination, Mr. Gaztambide proceeded to read the definition of subdivision from the book titled, *Subdivision Valuation* and stated as follows: "the definition of subdivision taken from the fourth edition of the dictionary of real estate appraisal can apply to a wide variety of valuation issues. We think of typical suburban subdivisions designed for single unit residential use where individual lots are sold to end users or homebuilders over time. A subdivision methodology can also be used to solve for a wide range of property types including residential subdivisions, office development, condominium projects, industrial parks and other properties in which the individual lots used or pods are sold over time." Mr. Gaztambide read from his deposition transcript (Exhibit C–28, pg. 54) in which he was asked whether this project fell under the definition of tract development and he answered yes.

Mr. Gaztambide stated that after determining the subject property the Interagency Appraisal and Evaluation Guidelines provide reliable methods for determining market values of properties. He testified that pursuant to his engagement letter he was requested to prepare individual valuations of the market valuation of each residential unit. Mr. Gaztambide testified that he was not retained to determine the best methodology to determine the value of the property, meaning the 15 residential units and the 2 commercial units (Exhibit C–23, Engagement Letter). He stated that he was not retained by Mr. Paul Lavergne to determine the market value of the 17 units as one subject property or the value to a single purchaser. Mr. Gaztambide stated that the effective date of his appraisal report was February 11, 2014. He stated that he did not discuss the particularities of this bankruptcy case in preparation for the appraisal report. Mr. Gaztambide stated that his best recollection is that he became aware that the plan proposes to surrender all the property to PRLP after he prepared his appraisal report. However, surrendering of the properties to PRLP does not affect the conclusion regarding the market value of the properties. He proceeded to read the definition of market value from his appraisal report which is as follows: "[t]he most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and

assuming that neither is under undue duress" (Exhibit D–29, pg. 15).

Mr. Gaztambide stated that he came to the conclusion that the 15 residential units and commercial units that comprise the subject property are secured by a single loan, but he was never provided with this information. He also stated that he was informed that there was a negotiation not an outright done deal regarding the surrendering of the subject property in satisfaction of the debt. However, he was informed of the surrendering of the subject property along the way. He stated that under the market value definition, the debtor would be the seller and the creditor would be the buyer. Mr. Gaztambide testified that under the scope of work standard it is required to consider case law. In this case, he did not consider any case law for his valuation. He stated that under the assumption of a bulk sale scenario, a discounting process would be applicable. He did not apply discounts in his appraisal because it was not part of his assignment. Thus, he did not consider marketing expenses, administrative expenses, costs of transferring the subject property to a creditor, entrepreneurial profit, maintenance fees, and insurance expenses. Mr. Gaztambide stated that these discounts are not necessary when one is appraising a single unit. These discounts are applicable when determining market value in a bulk sale to a single purchaser. He stated that he did not factor present value in his appraisal report.

Mr. Gaztambide agreed that by definition a tract development with unsold units is a project with 5 units or more that is constructed or is to be constructed as a single development. The appraisal for these properties under a bulk sale scenario must reflect deductions and discounts for holding costs, marketing costs, entrepreneurial profits supported by market data.

Mr. Gaztambide stated that in his appraisal report he included as an extraordinary assumption that the 15 existing unsold residential units should be delivered in approximately 30 months (1/2 a unit per month) and that the 2 commercial units should be delivered in approximately 18 months as duly supported by market evidence (Exhibit D–29, pg. 18).

Mr. Gaztambide in his appraisal report concluded that the aggregate market value of the fifteen (15) unsold residential units is $5,895,000 and that the aggregate market value for the two (2) commercial units is $1,530,000 for a total value of $7,425,000 as of the effective date of February 11, 2014.

*Mr. Luis Vallejo—Real Estate Appraiser*

Mr. Luis E. Vallejo Romeu, real estate appraiser, MAI (Member of the Appraisal Institute), testified that the bulk sale was the proper valuation methodology required for the present problem at hand. Mr. Vallejo stated that in the 2013 appraisal report his conclusion of value as to the aggregate retail value of the unsold subject units and locales was in the amount of $9,400,000 and their discounted market value was in the amount of $6,450,000. In addition, at that time the parking garage had not been sold and the conclusion as to the market value of the same was in the amount of $900,000 (Exhibit D–24). The parking garage was later sold with fewer parking units (originally 196 units, sold 160 units). Mr. Vallejo stated that he prepared a second appraisal report in the year 2013 because the master deed was revised and the size of the locales was increased. In addition, the difference in the parking spaces that were actually sold (160 units) and the ones that were going to be sold (196 units) were distributed amongst the two commercial locales. Before, each commercial space was allocated 10 parking spaces per locale. Now, the

locale facing Ribot Street has 27 parking spaces and the locale facing Ponce de León Avenue has 29 parking spaces. Mr. Vallejo testified that he prepared the 2014 appraisal report upon Mr. Lavergne's request since he wanted to know the value of the 15 unsold residential units and the 2 commercial locales. He stated that he informed Mr. Lavergne that there was a significant change in value and the latter requested a restricted report. Mr. Vallejo testified that in the 2014 appraisal report his conclusion was $5,700,000 for the sum of the aggregate retail values for the residential component and $1,900,000 for the commercial component for a total of $7,600,000. Under the discounted market value or value to a single purchaser in bulk basis for the overall property the value was $5,300,000 (Exhibit D–25). He stated that when you appraise a property that is comprised by various units, lots, single family dwellings the first and outmost motivation in buying that property is profit, thus the first deduction is a cushion for profit, the second deduction is for carrying costs during the absorption period and the third deduction is to account for the time value of money. The percentages used for the operating expenses were 3.5% for the sales expenses; 2.5% for marketing expenses; 1.5% for miscellaneous and 12% for profit. Mr. Vallejo testified that he reviewed Mr. Bonnin's appraisal report and concluded that in general terms they both used the same methodology. The differences were that they had concluded different values for the residential units and commercial locales. However, the areas used for the commercial locales were the revised ones and thus, they account for a higher value for these properties. In addition, Mr. Bonnin's appraisal report would have to account for the 36 additional parking spaces in the two (2) commercial locales. If the additional area of locale # 1 is accounted for which is 219 square feet at the market value and taking Mr. Bonnin's unitary value of $110 per square foot, the value would increase by $24,090 plus with the 17 additional parkings at $20,000 per parking space the value (as per Mr. Bonnin's unitary value) of locale # 1 would increase by $364,090. Locale # 2 now has an additional 434 square feet at $146 per square foot (as per Mr. Bonnin's unitary value) the value would increase by $63,364 plus 19 additional parkings at $20,000 per parking space ($380,000 increase in parking space) would increase the value of locale # 2 by $443,364. If you add the additional areas plus the additional parking spaces for commercial locales # 1 and # 2 this would increase the aggregate retail values by $807,454. Mr. Vallejo testified that if one rounds to $800,000 and adds it to Mr. Bonnin's value conclusion of $4,700,000 for the retail sales of the residential units and the $1,700,000 for the 2 commercial locales it would add up to $7,200,000 for the aggregate retail sales of the units.

Mr. Vallejo concluded that if Mr. Bonnin's appraisal report is adjusted to reflect the additional area and parking spaces for the two (2) commercial units the conclusion of value would be higher and in general terms consistent with his conclusion and once you discount that higher figure it is most probable that the discounted value of the property would also be consistent and higher of the value conclusion.

Mr. Vallejo also testified that he prepared a revised document of his previous February document because he realized the Friday before the day of the deposition that there had been an agreement between the owner and the broker to lower the sales price of the units, thus there was a lower list price for all unsold 15 units. He testified that he recalculated his discounted cash flow to $4,950,000. The aggregate retail value that was recalculated was

$7,085,000 based on the revised list prices. Mr. Vallejo stated that Mr. Bonnin's conclusion of value (gross residential value) for the residential component was $4,700,000 and his revised conclusion was $5,185,000 (Exhibit D—27(b)).

Mr. Vallejo opined that in general terms Mr. Bonnin used the same methodology and the values could be consistent, except for the fact that Mr. Bonnin applied an "arbitrary" adjustment of 25% based on location for the rear unit (commercial unit facing Ribot Street). However, he disagrees with this adjustment because, for example, the front locale was purchased for office use not retail use. He stated that the availability of the amount of retail space on Ponce de León Avenue is visually noticeable and thus, the highest and best use for the commercial locale facing Ponce de León Avenue is for office use not retail use as of the present date. Mr. Vallejo testified that the highest and best use for the entire property is to continue selling the residential units and the 2 commercial locales at the current absorption rate of one (1) per month for the residential units. However, for the commercial units there is a letter of intent to purchase the locale (facing Ponce de León Avenue) for a $1,000,000 which questions the discounting made by Mr. Bonnin on pg. 68 of the appraisal report (Exhibit C–5, pg. 68) because Mr. Bonnin's discounted value for both commercial units is $1,000,000 but it does not make sense if one will receive in the immediate future $1,000,000 for the commercial locale facing the Ponce de León Avenue. Then, this would mean that the locale facing Ribot Street is worthless. He also testified that Mr. Bonnin used the discounted cash flow analysis which is a very usual and valuable accepted technique but this technique is mainly used when markets are strong and stable to provide the benefit to the property that it can have rent increments throughout the years, but

with the current market limitations one has to estimate a value for the reversion on the first part for six years and then calculate its present worth. Mr. Vallejo stated that given the present market conditions he would have used the direct capitalization rate on the commercial properties which is the method used by Mr. Gaztambide (Exhibit C–5, pg. 74). Mr. Vallejo concluded that Mr. Bonnin's discounted value of the commercial properties in the amount of $1,000,000 should be revised because the number of parking spaces per locale has been increased substantially.

Mr. Vallejo testified that his conclusion of retail value as to commercial property fronting the Ponce de León Avenue was $1,000,000 and as to the commercial locale in Ribot Street his conclusion of value was $900,000. Mr. Bonnin's retail conclusion of value for the commercial property fronting Ponce de León Avenue was $1,000,000 and for the property on Ribot Street his retail conclusion of value was $700,000. He stated that his conclusion of market value of the property is $4,950,000 (Exhibit D–27(b)). His conclusion for the retail value of the commercial units was $1.9 million and then this figure is discounted for certain expenses such as marketing, profit, present value and miscellaneous. He testified that aggregate retail value is not market value but the individual values of a property component. In this case, it is the sum of the individual market values of 15 residential units and 2 commercial locales. Mr. Vallejo agreed that in this case pursuant to the Appraisal Institute, market value is the most probable price for which the 17 units would be sold to a single buyer that is prudent and knowledgeable. Mr. Vallejo explained that his conclusion of market value was altered because 3 or 4 days before the deposition he was provided with a revised price list. He explained

that in order to reach the market value conclusion in Exhibit D–27(b) expenses, costs and profit must be discounted. Also, one must take into account the present value of the net income generated by the sales from the units to end users (money now is worth more than money later). Mr. Vallejo stated that the absorption rate of the project for the last three (3) years has been hovering around 1 unit per month. However, the absorption rate in the year 2012 was 1.2 units; in the year 2011 it was 1.8 units; and in the year 2010 it was 3.3 units. Mr. Vallejo testified that the absorption rate had gone down throughout the years but it is not necessarily because the least attractive units are the ones that are sold at the end. However, this is a factor that could affect absorption rate and it has happened in some projects. He stated that as to the penthouse units the absorption number does not hold true in the recent past but one must factor is that in his revised document he lowered the value of the penthouse units by $48,000 to $50,000 per unit. The retail value of the penthouse unit is now $475,000 per the revised February 2014 list price. During the last fourteen (14) months only one penthouse unit has been sold. Mr. Vallejo explained that the typical market behavior is that when prices are lowered the absorption picks up, thus one can say that my absorption rate number is somewhat conservative in not lowering the absorption rate of one per month. If the absorption rate decreases, then the value of the properties decreases because you have more time into the future to deal with. He stated that of the 15 residential units he appraised, 7 of them are penthouse units. Mr. Vallejo explained that he did not take into consideration the location of the Ribot commercial space properties because he thinks that the highest and best use is for office space since there are certain businesses that do not need exposure. He

stated that for retail space a location in Ponce de León Avenue used to be more attractive but now there is no demand for retail space in the area from the Sagrado Corazón station to Miramar. He stated that he also based his conclusion on the fact the front locale is being purchased for office use.

Mr. Vallejo testified that pursuant to the revised document he prepared (Exhibit D–27(b)) under the value to a single purchaser the 12% profit component would equal $850,200. The total holding costs and expenses not including the profit component would equal $531,375. Mr. Vallejo calculated that if the aggregate retail values of the residential and commercial units ($7,085,000) was taken and only the holding costs and expenses were subtracted (excluding the profit component) that would result in $6,553,625 and then this figure would have to be discounted to present value. The difference in the absorption rate from the year 2012 and 2014 is not a significant difference especially when the last numbers were revised and the sales prices of the units were dropped significantly.

Mr. Vallejo testified that in his 2013 appraisal report he included a list of the most recent units that were optioned which included a penthouse unit (unit # 2001) that had a sales price of $551,500 and which was later sold (Exhibit D–24). He stated that currently the highest asking price for a penthouse unit is $505,000 which is approximately $45,000 lower. The sales price for the other penthouse units is $475,000. Right now, the sales price for the penthouse units are lower than the selling price for the penthouse unit that was sold.

Mr. Vallejo restated that the market value of the subject property is $4,950,000 and any factor that is taken out of his calculation or methodology would affect

the market value opinion. One could eliminate the profit line item but would have to increase the discount rate to incorporate the profit into the discount rate but you would have to consider profit. He stated that the risk of a longer absorption rate and price reduction is a buyer's risk and one always looks at market value from the shoes of the buyer. Mr. Vallejo testified that Mr. Bonnin used a 25% discount rate, profit included and his discount rate was 20% plus the 12% profit to account for the period it would take to sell the property and bring the proceeds to their present worth.

Mr. Vallejo concluded that the aggregate retail sales value of the residential units is $5,185,000 and that the aggregate retail sales value of the two (2) commercial locales is $1,900,000. He concluded that the market value to a single purchaser (bulk sale) of both the residential and commercial units is $4,950,000 as of the effective date of March 14, 2014. He stated that he did not segregate the total bulk value to a single purchaser into the residential and commercial component.

*Mr. Rafael Bonnin—Real Estate Appraiser*

Mr. Rafael Ernesto Bonnin Suris testified that he has a bachelor's degree in industrial engineering, is a licensed real estate appraiser and a certified general appraiser. He stated that he is an MAI (member of the appraisal instate) and holds a CRE (Counselors of Real Estate) designation. He stated that he has been appraising for over twenty years. Mr. Bonnin testified that he was engaged to provide an opinion of market value of the subject property "as is" condition per the current date of the appraisal. The subject property consists of a group of units that remain unsold in a condominium; 15 residential units and 2 commercial locales. Mr. Bonnin testified that as part of the methodology employed he relied on the information from a 2012 report prepared by Mr. Luis Vallejo for the areas of the units. He stated that due to the adversarial nature of the proceedings, the client requested Mr. Bonnin not to contact the property owner. Mr. Bonnin stated that he did not visit the property for this particular engagement due to the adversarial nature, but that he has visited the property in the past as a real estate appraiser looking for comparable sales. He stated that he visited the project in the year 2013 because he was interested in purchasing an apartment at that time. He received from the client the last sales that had occurred since his previous appraisal report in the year 2012. He testified that then he proceeded to get information from other comparable projects to perform his analysis. Mr. Bonnin testified that the first step the analysis entails is to identify the problem thus, you need to identify the intended use of the property which in this case is that it will be surrendered in bulk to the creditor under a court proceeding. The intended use in this case is the surrender in bulk, thus, it entails a bulk sale valuation. Under the bulk sale valuation there are two (2) approaches (2 types of analysis) which are the sales comparison approach if you are able to find sales that were transacted in bulk, like 50 units in "x" condominium and 12 units in "y" condominium, then you can use the direct sales comparison approach based on the price per square foot of the units involved. However, this was not the case for this property. Thus, you employ an analysis that models what a typical buyer (investor) would do for a group of units which is to consider what would be the gross price at which the investor could sell the units. To figure out the gross price to sell the units, the investor would have to consider various factors such as: sales incentives, current holding costs, self-related cost, time

value of money and profit which would equate the current value of the property in "as is" condition, given that the primary motivation of an investor which would be the typical buyer for a group of units is to realize a profit after covering all the expenses. The sales comparison approach is included in my appraisal report for the residential units and the same begins on pg. 42 of the appraisal report (Exhibit C–5, pg. 42). After looking at the historical sales for the years 2011, 2012 and 2013, which reflect that prices have been declining from 2012 to 2013 and there has also been a decline in the absorption rate from 1.8 units per month in the year 2011, 1.2 units per month in the year 2012 and 0.8 units per month in the year 2013. The absorption rate is based on the sales of the property. The decline in prices is evident from comparing the sales prices in the years 2012 to 2013 in both condominiums. Mr. Bonnin testified that he also looked at other projects in which he found a similar pattern, for example in a project named "The City" prices in the year 2012 were about $170 per square foot and in 2013 the last units that were sold the price was $112 per square foot. In another project named "Coliseum Tower Residences" the units in 2012 sold for $190 per square foot and the units in 2013 sold for $144 per square foot, thus it seems that the market is declining both in absorption and in prices per square foot. Mr. Bonnin testified that the analysis is segregated (divided) into the typical size units (which are about 1400–1500 square feet in area) and the large penthouse units which have over 3400 square feet in area. The average price in the year 2013 for the typical unit was $174 per square foot. However, it turns out that in the north tower all the units that remain unsold end in "05". and face south towards the other building which are the least attractive views of the building, and the two (2) units that were sold during the year 2013 sold for $158 per square foot which is lower than the average for all of the units sold during 2013. Then he analyzed the average price for the remaining units based on the price list provided by the broker and it is $154 per square foot which is lower. He stated that there is a continuing downward trend and these sales are taking close to one (1) unit per month thus there is an additional year and a half of sales so most probably the sum of these units will have lower prices. Mr. Bonnin explained that for these remaining units he deducted an allowance of $5,000 for each of those typical units to account for the reduced prices. However, some units will have to be further reduced into the future.

Mr. Bonnin stated that Exhibit C–13 (Sum of Retail Sales—Large Residential Penthouse Units) is a table he prepared to illustrate his analysis and rationale for the pricing of the large penthouse units. He explained that in his analysis he averaged the price per square foot of all units sold during 2013 which was $173 per square foot. Then, he averaged the net asking price (after the incentives) of the typical units that the developer has in its inventory which is $160 per square foot which is an 8% reduction in price. Mr. Bonnin explained that when he was valuing the penthouses he had to take into consideration the fact that there has only been one (1) sale during the last six (6) years. There was a sale in September of 2013 which sold at $149 per square foot. The current developer net price is at $137 per square foot which is an 8% reduction in price and matched the values by Mr. Vallejo. Mr. Bonnin opined that this price reduction is not enough to generate sales because if the developer is reducing 8%, the prices of the typical units that are selling and is also reducing the penthouses by the same percentage amount is not

going to motivate sales. The penthouse units have to be discounted more than the typical units because they are not selling and the same were discounted 20% from the current asking prices and our value indication was $120 per square foot for the penthouse units. Mr. Bonnin stated that the typical units were reduced by $5,000 from the asking price and for the 7 large penthouse units the average price per square foot of $120 was applied to all of them resulting in an aggregate retail value of $4.7 million for both the typical units and the penthouse units. The aggregate retail value for all the residential units is found on page 54 of the appraisal report (Exhibit C–5, pg. 54). Then, the estimated absorption period needs to be estimated. Mr. Bonnin stated that for the past 2 years and 2 months the absorption rate for the typical units has been closed to 1(one) unit per month. However, the absorption rate for the penthouse units was also estimated at 1(one) per unit, given that the penthouse units were reduced by 20% from the current asking prices to motivate sales. Mr. Bonnin explained that this absorption rate is reflected in the cash flow because it will take 15 months (5 quarters) to sell the units (Exhibit C–5, pg. 59). He further stated that during that absorption period one has to account for sales commissions, marketing expenses, legal expenses, the condominium home owners' association fees that the developer has to pay monthly for the unsold units, the general administrative expenses of managing the property, and insurance expenses for the units. These expenses have to be deducted in the cash flows from the aggregate retail values of the units resulting in the net sales revenues. Then, the net sales revenues are discounted to present value using a discount rate by either using a profit allowance as a line item expense and then use a discount rate like Mr. Vallejo did or a rate that includes the profit component which is

the method he used. Mr. Bonnin stated that his conclusion of market value as to the residential units was $3.3 million. He defined market value as the most probable price that the specified property rights will sell for in an open competitive market between a single buyer and a single seller each acting prudently and knowledgeably. The definition of market is defined by the Appraisal Institute and by FIRREA. Both definitions of market value have basically the same concepts.

Mr. Bonnin stated that his conclusion as to the market value for the commercial spaces was $1 million. He testified that he first employed the sales comparison approach with two (2) comparable sales. The sales were adjusted for differences in parking ratio and the existence of interior improvements. He concluded that both comparable properties were superior to the subject property, thus he adjusted the unitary values for those two (2) transactions. Then, he revised the letter of intent for locale # 2 (fronting Ponce de León Avenue) for a $1 million which based on the area calculated had a unitary price per square foot of $146 which is lower than the two (2) comparable sales. He stated that it has come to his attention that the areas of the commercial locales and the number of parking spaces allocated to each locale have increased Mr. Bonnin testified that despite these changes in area and number of parking spaces his opinion of market value for the two (2) commercial locales would not change because the rationale of the analysis was whether or not the letter of intent price was supported by market or not and my analysis stated that both properties were superior and the unitary price of the subject property was lower. Mr. Bonnin stated that he would have still concluded that the subject property's market value is lower as supported by the market even if the number of parking

spaces were added which would also increase the price per square foot of the 2 comparable sales which are superior. Mr. Bonnin testified that $1 million is a reasonable market value given that it is the first time in 6 years that there is a letter of intent to purchase the locale. He concluded that the market value of the front locale was for $1 million. Mr. Bonnin testified that the rear locale is inferior because it has no exposure to Ponce de León Avenue despite the high vacancy in retail and in office space since both markets are depressed, especially the office market. The front locale always has the potential of being used either for retail use or office use. Moreover, some types of office use benefit from the exposure to the pedestrian traffic and people being able to find the place and that is the reason as to why a 25% discount was applied. Mr. Bonnin further testified that the photograph of Exhibit C–13 shows that the Ponce de León locale has direct exposure to the avenue and the rear locale is located on the corner of Villamil Street and Ribot Street. However, Ribot Street is a dead end, street, not a full traffic street. Mr. Bonnin opined that the locale facing Ribot Street is an inferior locale because it is less attractive to a typical buyer because the front locale has additional potential for some office uses and for future retail use that the rear locale does not have and the market does recognize a location adjustment even if it is for the same use. For example, the residential units which face south on the north tower sell for less than the units facing north and both are for the same use.

Mr. Bonnin testified that the table titled, Sum of Retail Sales—Commercial Units (Exhibit C–13, pg. 3) shows the price that the developer has for the unit which is the letter of intent of $1 million. The area that Mr. Vallejo used was 7,275 which would equate $137.46 per square foot. Mr.

Bonnin stated that he used a different area which is the interior retail area that he had. As a matter of fact, each locale has two (2) areas according to the plot plans that were included in the Gaztambide appraisal of which he was provided a copy after submitting his report. It has a construction area and an interior surface area which is the typical area used to rent or sell which is lower than the one used in the previous appraisal. Mr. Bonnin explained that he appraised the commercial locale for $1 million based on the letter of intent which he found reasonable. The letter of intent is valid market evidence in terms of the market value of that locale supported by the comparable sales and the conclusion of value was for $1 million which is the same value that Mr. Vallejo concluded. He stated that the difference is that he applied a 25% discount to the rear locale which he opines has an inferior location. He testified that his conclusion of value for the rear locale was $700,000. It's a 30% difference in price because the unit is smaller but there is a 25% difference in the price per square foot. Mr. Bonnin stated that in the commercial locales there is a difference in the aggregate retail value of $200,000 in the rear locale.

Mr. Bonnin testified that he prepared a table named, Comparison of Appraisal Parameters, which illustrates the differences in the value parameters and the impact in the value opinions between his appraisal (market value to a single purchaser = $4,300,000) and Mr. Vallejo's appraisal (market value to a single purchaser = $4,950,000) (Exhibit C–13, pg. 1). In the aggregate retail values for the typical units there is a 3% difference which is a $60,000 difference. This is an immaterial difference. However, in the penthouse units there is a 14% difference in the aggregate retail value which is a $418,000 difference and it is a large difference. Mr. Bonnin

stated that this marked difference in the penthouse units is because he concluded that the penthouses need to be further reduced because there has only been one (1) penthouse sale in six (6) years. This means that the market has not accepted that price. Mr. Bonnin testified that Mr. Vallejo reduced the penthouse units by 8% from the last sale and that he applied a 20% price reduction. As to the commercial locales, the difference is based upon the 25% reduction in price per square foot of the rear locale which has an inferior location. The absorption rates for the residential and commercial units are basically the same. There is only a difference of $27,606 in the amounts of sales and holding costs (Mr. Vallejo's has an amount of $531,225 and Mr. Bonnin $503,619). Mr. Bonnin stated that the methodology Mr. Vallejo used with the split method of profit and discount rate provides for the same net discount as his methodology of 25% discount. The differences in the conclusions of market value are due to the differences of opinion regarding the value of the penthouses and the value of the rear commercial locale facing Ribot Street. Mr. Bonnin further testified that the discount raté is a measure of risk which has several components. The risk-free rate is the benchmark against which all investments are measured. Then, there is the liquidity risk and real estate is not liquid. In our case it will take a year and a half to realize the sale. There is also a default risk which in real estate equates to prices being further reduced and/or the absorption being slower. The default risk is accounted for in the profit because the higher the default risk, the higher the profit expenses are required to motivate you to enter into a transaction. Mr. Bonnin explained that the present value takes into account the time value of money because the other component of the discount rate is inflation risk. A dollar today is worth more than a

dollar a year down the road. The difference as to the market value in the two (2) appraisal reports is $650,000 which is due to the differences in the market value of the penthouses and the rear commercial locale on Ribot Street. Lastly, Mr. Bonnin concluded that based upon his appraisal report (Exhibit C–5, pg. 2) the value opinions as of March 11, 2014 consisted of the following: the residential component has a market value in the amount of $3.3 million and the commercial component has a market value of $1 million for a total market value of $4.3 million in bulk.

Mr. Bonnin testified that in his preparation of the 2014 appraisal report he did not personally inspect all of the units. He stated that his report does not include the correct areas for the commercial locales and the number of parking spaces allotted to each locale because that information was provided after. Mr. Bonnin stated that he has not seen the rectification deed but has seen the plot plan with two (2) areas. He testified that he has revised Mr. Vallejo's 2014 appraisal report in which he has the total construction area which includes other areas that are not the main retail area. Mr. Bonnin testified that pursuant to Mr. Vallejo's report (Exhibit D–24) the total construction area for the commercial locale facing Ponce de León Avenue (locale # 2) was 7,275 square feet and the total construction area for the locale facing Ribot Street (locale # 1) was 6,540 square feet. He stated that if one were to apply the unitary price he allocated to each commercial space to the total construction areas for the two (2) commercial locales, the value would not be higher because it would be incorrect to proceed in that manner. He stated that he did not conclude that unitary price. He stated that he concluded a retail value of $1 million based on the letter of intent regardless of the area it has and he concluded a

retail value of $700,000 for the rear commercial locale. Mr. Bonnin explained that for the rear commercial locale he applied a 25% adjustment for location and that's the only reason he computed the price per square foot because it is a smaller locale. Mr. Bonnin stated that commercial locale # 1 based upon the area he had at the time had a unitary price of $110 per square foot. He concluded that locale # 1 was 25% less than locale # 2 which was appraised at $1 million. Mr. Vallejo and Mr. Gaztambide also appraised locale # 2 as having a value of $1 million. Mr. Bonnin stated that if the area of locale # 1 were increased, then the unitary price would be lower. He explained that one does not adjust the property, one adjusts the comparable sales. Mr. Bonnin explained that pursuant to his report the value of the subject unit locale # 2 has to be lower than the comparable sales because both comparable sales are superior. He further explained that he adjusted locale # 2 by 25% due to inferior location not liquidation. Mr. Bonnin stated that when he prepared his report he did not have the current number of parking spaces. He also stated that his 2014 appraisal report (Exhibit C–5) misstated on page 9 in which it describes the property rights appraised as a fee simple interest to a single purchaser of the under construction project and a remnant parcel, both upon completion and as of a current date. It should have said completed project with unsold units. He testified that he also prepared an appraisal report for O'neill & Borges on December 21, 2012. The 2012 appraisal report included a parking facility which he valued at $600,000 and was later sold at $900,000.

Mr. Bonnin stated that in his 2014 appraisal report the aggregate retail value for the residential component is $4.7 million. Mr. Bonnin explained that this value was derived by analyzing the historical sales of the property, the asking prices of the property and comparable sales in several condominiums. He further explained that for the typical residential units he looked at the asking prices and at the trends in the comparables and the historical sales in the project. He concluded that the asking prices were relatively within market but deducted $5,000 per unit based upon the following: (i) appraisals are done moving forward (meaning that the date of appraisal is today but the units will be selling for a year and a half); (ii) decreasing values based on historical trends; and (iii) to account for further negotiations in price. He stated that the $5,000 deduction was a flat deduction per unit to the asking prices and was not based on a unitary value conclusion. The comparables used where from Ciudadela, The City and the Coliseum and there were 13 sales during the years 2013 and 2014. Mr. Bonnin stated that the conclusion of value is net of incentives and after deducting the $5,000 flat fee per unit. He also stated that the retail value of the unsold units is lower than the sales price of similar units in 2013 (Exhibit C–5, pg. 52). He stated that if he compared the prices of the units included in the appraisal reports he did in 2012 and 2014, the typical units had a price which was on average $50,000 lower than in the 2012 appraisal report.

Mr. Bonnin testified that the asking price for the penthouse units according to the broker is $495,000 and these units have $20,000 in incentives for a net value of $475,000. He stated that in his 2014 appraisal report the average retail value per penthouse unit is $415,000. He also stated that in his 2014 appraisal report he included information that a penthouse unit was sold in September 2013 net of incentives in the amount of $551,500 (asking price was $575,000). He testified that in his appraisal report the retail value of similar pent-

house units is $136,000 less than the sales price of the penthouse unit that was sold in September 2013 (Exhibit C–5, pg. 43). He further testified that in his 2012 appraisal report the penthouse unit that was sold in 2013 had a retail value of $573,000. The reduction in value of the penthouse units is due to a 20% discount over the asking price.

Mr. Bonnin testified that for the commercial locales, the second comparable he used was a property on Bolivia Street that was sold at liquidation value (Exhibit C–5, pg. 64). He explained that he made a 25% adjustment to the comparable because it was sold at liquidation value. Mr. Bonnin clarified that a 20–22% discount was applied to the penthouse units due to market conditions not due to liquidation. He stated that to calculate the bulk value of the residential component a 25% yield rate was used.

Mr. Bonnin testified that to compute bulk value, the aggregate retail value of the units first needs to be computed, then a series of operating expenses have to be deducted. He stated that he included in those operating expenses the arrears of the homeowners' association fees which were due as of the date of the appraisal. If these fees are current, then the cash flow will be higher and the bulk value may be higher depending on the rounding. The fees were in the amount of $25,000 for the commercial and $45,000 for the residential. He stated that the final step in computing bulk value is to apply a yield rate which brings the cash flow to a present value. The yield rate includes a profit component. He stated that he used a yield rate of 25%. Mr. Bonnin explained that if all other things being equal, a higher yield rate will yield a lower value. He stated that his appraisal report includes a chart (Exhibit C–5, pg. 57) which details 6 projects that have yield rates that range

from 21–33%. None of these projects are located in the metropolitan area and these projects are in raw condition and need to be developed. Three of these projects do not have the necessary permits. Also, none of these projects are condominiums with mixed use like the Metro Plaza Tower project. Mr. Bonnin stated that the yield rate also provides for the risks the investor may undertake in obtaining the permits, the design, the costs, the construction and the sales costs of the project. He further stated that his conclusion of value for the commercial units using the sales comparison approach was $1.1 million and using the income approach it was $1 million.

Mr. Bonnin stated that he concluded that the highest and best use for these units was to continue their current and legally permitted use which is the existing residential and commercial use of the units and to continue selling the units.

Mr. Bonnin testified that Exhibit D–27(b), Mr. Vallejo's recalculation of the value to a single purchaser, reflects that the gross residential value was $5,185,000 and the gross commercial value was $1,900,000. The percentages for the sales expenses were 3.5%, legal expenses were 1.5% and overhead and other expenses were 2.5%. The discount rate used was 20%. Mr. Bonnin stated that Mr. Vallejo used a profit component of 12%. Mr. Bonnin stated that the new document Mr. Vallejo prepared (which was not submitted into evidence) had a higher gross retail value for the residential component of $5.7 million as opposed to Exhibit D–27(b) in which the gross residential retail value was $5,185,000. He stated that the figures for the gross commercial component, all of the expenses and the discount rate were the same as those included in Exhibit D–27(b). The new document Mr. Vallejo prepared excluded the 12% profit component. Mr.

Bonnin testified that what the new document reflected is not market value or bulk value or anything having to do with fair market value if the profit component is excluded Mr. Bonnin stated that Exhibit D–27(b) and the new document are not comparable because Mr. Vallejo did not use the same figure for the gross residential component. In the new document Mr. Vallejo used a higher number for the gross residential component, thus the end number will be higher. Mr. Bonnin stated that if the profit component of 12% (which amounts to approximately $850,000) were excluded from the mathematical computation, then the end number would increase.

Mr. Bonnin stated that, in general terms, market value is defined as the most probable price that specified property rights will be transacted between a willing buyer and a willing seller each acting prudently and knowledgeably and with appropriate exposure time in the market. This definition is based on the federal government's definition which is used for regulated institutions and also from the Appraisal of Real Estate, the 13th edition which is a major publication in real estate appraisal. He stated that the hypothetical calculations which he was asked about, under a bulk value scenario are not market value because the motivation of a willing buyer to buy a group of units is to realize a profit when reselling the units. The profit component must be deducted if it is going to be called market value.

Mr. Bonnin stated that his conclusion of market value for the project was $4.3 million which is broken down into $3.3 million for the residential component and $1 million for the commercial component (Exhibit C–5). Mr. Bonnin stated that for the Ponce de León commercial locale, they both had the same gross commercial value of $1 million and for the locale facing Ribot Street there was a $200,000 difference.

He stated that for the commercial locales the difference in square footage does not affect his conclusion of value because his analysis was that the price per square footage of the subject property should be lower because the comparable sales used were superior. If the comparable sales were adjusted for the parking spaces, then the comparable sales would have a higher unitary price which makes sense because they are superior. He stated that he appraised the commercial locale at $1 million taking into consideration the letter of intent.

Mr. Bonnin testified that a 25% adjustment was applied to the rear commercial locale to recognize that it has an inferior location at the rear of the project where it corners a dead end street. As to the residential units, he explained that there is a difference in the conclusions of value between his 2012 appraisal and the 2014 appraisal because the market conditions have deteriorated. The 2013 residential sales at the project have a lower unitary price than the 2012 sales. This also occurred in Coliseum Towers and The City projects. Thus, if prices for the next year and a half are projected, the downward trend in prices needs to be considered. This trend was recognized in the typical residential units by applying a $5,000 per unit adjustment to account for this downward trend. He further stated that for the penthouse units a higher discount was applied, given that only 1 penthouse unit has sold over the past 6 years, which means that the market is not accepting the current prices if not there would be more sales like for the typical units. There are 7 penthouse units left and only have 2 parking spaces. Generally penthouse units have 3 parking spaces assigned.

Mr. Bonnin clarified that there are two (2) ways to address discount rate and profit. One way is to do it in a split way which

is the method that Mr. Vallejo used or use a yield rate that includes profit. He stated that he calculated his cash flows using Mr. Vallejo's split method and also used Mr. Vallejo's cash flows using his single method and the result was exactly the same. Mr. Bonnin concluded that Mr. Vallejo's combination of profit and discount rate has the same end result as his 25% combined yield rate. He further stated that they look into the market for data on projects and it must be recognized that projects have different risks at different stages. All projects begin with the raw land parcel and these yield rates are for the entire life of the project. He stated that in his report the yield rates ranged from 21%–30%. A 25% discount rate was chosen based on the current project conditions and current market conditions. The alternative is to use published rates from the United States, which are even less comparable. He stated that he did not find 3 or 4 projects in Hato Rey or Santurce which he would have been able to extract yield rates that are reasonable. Thus, he used local data.

Mr. Bonnin explained that the owner of the group of properties is the one who bears the risk if the absorption period is longer than what was forecasted. The buyer will assume two major risks; absorption and further decreasing prices. In valuation, these risks are accounted for in the yield rate or in the profit and discount rate combination used.

Mr. Bonnin stated that the homeowners' association fees would have no significant impact in his conclusions of value because his conclusion for the bulk value for the commercial component was largely based on the income approach. Depending on the rounding it would have been between $0–$100,000 difference.

Mr. Bonnin restated that for the Ponce de León locale, Mr. Vallejo and himself had the same retail value of $1 million and for the Ribot locale, Mr. Vallejo's retail value was $900,000 and his retail value was $700,000. He stated that the aggregate retail value for the residential component was $4.7 million and for the residential component it was $1.7 million for a total aggregate retail value of $6.4 million. Mr. Vallejo's conclusion of aggregate retail value for the commercial component was $1.9 million and the residential component it was $5,185,000 for a total aggregate retail value of $7,085,000. The difference in total aggregate retail value is $685,000 (Exhibit C–13).

The court asked Mr. Bonnin several questions regarding his testimony. Mr. Bonnin clarified that the additional number of parking spaces for the commercial locale facing Ponce de León Avenue would not change his valuation because the $1 million letter of intent is for the commercial locale with the increased number of parking spaces. He further stated that in his 2012 appraisal report a unit that had a value of $263,000 was valued in the 2014 appraisal report in the amount of $216,000. Mr. Bonnin clarified that the net price the developer is now asking is $221,000. The $216,000 figure includes the $5,000 adjustment which accounts for the heavy discounts applied to the last units that are sold in the projects. For example, the discounts applied to the last units sold in other projects such as Coliseum and The City was 24% and 36%. This is consistent with the downward sales trend. Mr. Bonnin stated that some of these units will sell at the developer's price but others will probably get a $10,000 discount at the end. There are 7 of these units, so it's about a $35,000 deduction from the developer's asking price. Mr. Bonnin clarified that these are net asking prices after excluding the incentives.

Mr. Bonnin further clarified that since this was a completed project, the two (2) key factors which influenced the yield rate were the risk of lower sales and the risk of further price reduction plus the profit component. He stated that these risks were not as to completed construction risk. Mr. Bonnin stated that he used a 25% yield rate due to the absorption risk and the risk of further reduction in prices which is taken into account. He explained that it is an average risk over the different phases of a project. For example, if you are holding the land the risk is really low. However, when you are building, the risk will increase to 40–50% and when you are selling the risk will be around 25%. Mr. Bonnin also explained that the yield rate includes a present value component in addition to the risk components. He stated that the rates he considered in his appraisal report were not for completed developed projects, but for projects that do not have permits only raw land and the yield rate for these projects ranges from 21–33% (Exhibit C–5, pg. 57).

Mr. Bonnin concluded that the aggregate retail sales value of the fifteen (15) unsold residential units is $4,700,000 and that the aggregate retail sales value of the two (2) commercial locales is $1,700,000. He concluded that the market value to a single purchaser (bulk sale) of both the residential and commercial units is $4,300,000 as of the effective date of March 11, 2014. The market value to a single purchaser of the unsold fifteen (15) units is $3,300,000 and the bulk value of the two (2) commercial units is $1,000,000.

### Applicable Law and Analysis

*Secured Creditor Cramdown pursuant to 11 U.S.C. § 1129(b)(2)*

A Chapter 11 plan that satisfies all the requirements of Section 1129(a) except for 1129(a)(8), which requires all impaired classes to accept the plan, may be con-firmed if the requirements of Section 1129(b) are met. The debtor classifies in its plan of reorganization the administrative claimants, the creditors, and the equity holders into different classes based upon the similarity of their claims or interests pursuant to 11 U.S.C. § 1122. In the instant case, PRLP has voted against the proposed plan, thus Section 1129(b) must be satisfied before the Debtor is allowed to cramdown PRLP's claim. Section 1129(b)(1) provides in pertinent part that a bankruptcy court: "shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). Section 1129(b) creates an exception by permitting confirmation of non-consensual plans pursuant to what is commonly referred to as the "cramdown" provision, and it applies when the debtor is proposing to force an unaccepting class to accept a certain treatment proposed pursuant to the plan of reorganization.

Section 1129(b)(2)(A) provides three (3) alternatives for a Chapter 11 plan to be fair and equitable standard to a dissenting class of secured claims. A secured claim pursuant to 11 U.S.C. § 506(a) is one that is either "secured by a lien on property in which the estate has an interest" or one that is "subject to setoff under section 553." 11 U.S.C. § 506(a). The amount of the claim secured is limited "to the extent of the value of such creditor's interest in the estate's interest in such property," or "to the extent of the amount subject to setoff." *See* Alan N. Resnick & Henry J. Sommer, 7 *Collier on Bankruptcy* ¶ 1129.04[2] (16th ed. 2014). Section 1129(b)(2)(A) provides:

"[f]or the purpose of this subsection, the condition that a plan be fair and equita-

ble with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as to the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (ii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims." 11 U.S.C. § 1129(b)(2)(A)(i)–(iii).

▇ It is important to note that: "[t]he plan proponent must satisfy at least one of the three tests in order to confirm the plan, but not in the sense that compliance with one of the three tests is necessarily sufficient for confirmation purposes. As a number of courts have recognized, the fair and equitable standard also embodies a number of implicit requirements, including the requirement that the plan not unfairly shift risk of loss to the secured creditor. In order to maintain the secured creditor's relative balance of risk,

the secured creditor cannot, among other things, be put in a worse off position from a collateral perspective. From a functional point of view, the relevant standard is the equivalent of requiring the maintenance of adequate protection during the relevant chapter 11 repayment period." *See* Alan N. Resnick & Henry J. Sommer, 7 *Collier on Bankruptcy* ¶ 506.03[7][d][iii] (16th ed. 2014).

▇ Thus, a plan may satisfy the standards of 11 U.S.C. § 1129(b)(2)(A)(i), (ii), or (iii) and not be "fair and equitable" if it unduly shifts the risk of loss to a secured creditor. The Fifth Circuit Court of Appeals in the case of *In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346, 1352 (5th Cir. 1989), *reh'g, en banc, denied*, 889 F.2d 663 (5th Cir.1989) stated: "[t]o begin with, simple technical compliance with the requirements of section 1129(b)(2) does not assure that the plan is fair and equitable. Instead, this section merely sets minimal standards that a plan must meet, and does not require that 'every plan not prohibited be approved.'" *In re Sandy Ridge Dev. Corp.*, 881 F.2d at 1352 quoting *In re D & F Construction, Inc.*, 865 F.2d 673, 675 (5th Cir.1989).

The legislative history of 11 U.S.C. § 1129(b)(2) provides guidance as to what constitutes the "indubitable equivalent" of a secured claim. "Abandonment of the collateral to the creditor would clearly satisfy indubitable equivalence, as would a lien on similar collateral. However, present cash payments less than the secured claim would not satisfy the standard because the creditor is deprived of an opportunity to gain from a future increase in value of the collateral Unsecured notes as to the secured claim or equity securities of the debtor would not be the indubitable equivalent." H.R. Rep. 95–595, 95th Cong., 2d Sess. (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6544. "Courts have

held that the 'indubitable equivalent' standard requires that there be no doubt that replacement recoveries are equal to existing security interests. *See In re Philadelphia Newspapers, LLC,* 599 F.3d 298, 310 (3rd Cir.2010) ('Thus the "indubitable equivalent" under subsection (iii) is the unquestionable value of a lender's secured interest in the collateral'); *See also In re Salem Suede, Inc.,* 219 B.R. 922, 935 (Bankr.D.Mass.1998) (requiring that 'there [be] no reasonable doubt that [the subject creditor] will receive the full value of what it bargained for') (internal citation omitted)." *In re LightSquared Inc.,* 513 B.R. 56, 96–97 (Bankr.S.D.N.Y.2014).

■■■ In the instant case, the Debtor argues that its proposal to surrender the subject property to the secured creditor constitutes the "indubitable equivalence" of PRLP's secured claim pursuant to 11 U.S.C. § 1129(b)(2)(A)(iii). The "indubitable equivalence" issues arise in determining whether the real property being surrendered is worth the amount of the secured claim. "The phrase 'indubitable equivalent' is a term of art. It means, in essence, that the treatment afforded to the secured creditor must be adequate to both compensate the secured creditor for the value of its secured claim and also insure the integrity of the creditor's collateral position." *See* Alan N. Resnick & Henry J. Sommer, 4 *Collier on Bankruptcy* ¶ 506.043[7][d][i] (16th ed. 2014). The concept of "indubitable equivalence" originated from Judge Learned Hand's opinion in *Metropolitan Life Ins. Co. v. Murel Holding Corp. (In re Murel Holding Corp.),* 75 F.2d 941 (2d Cir.1935). The Second Circuit in *In re Murel Holding Corp.* stated the following regarding the concept of "indubitable equivalence:"

"It is plain that 'adequate protection' must be completely compensatory; and that payment ten years hence is not

generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most indubitable equivalence." *In re Murel Holding Corp.,* 75 F.2d at 942.

"As applied, most courts recognize that the test of indubitable equivalence has two (2) requirements: '(1) that the secured creditor receive the present value of its secured claim; and (2) that the Plan 'ensures the safety' of the secured creditor's principal.'" *See* Alan N. Resnick & Henry J. Sommer, 4 *Collier on Bankruptcy* ¶ 506.043[7][d][i] (16th ed. 2014) citing *Aetna Realty Investors v. Monarch Beach Venture, Ltd. (In re Monarch Beach Venture, Ltd.),* 166 B.R. 428, 434 (C.D.Cal. 1993).

The concept of "indubitable equivalence" is difficult in nature because it may be subject to various factors. "Clause (iii) is the most vague and potentially far-reaching of the three clauses. It is vague because it merely states that the plan shall provide 'for the realization by such holders of the indubitable equivalent of such claims.' It is potentially far-reaching because what constitutes the "indubitable equivalent" may involve highly subjective calculations. In a particular case, or during a period of national or local economic troubles, a judge may ease the standard to enhance the feasibility of a plan for the benefit of other interested parties or of society as a whole. The problems involved with the interpretation of this concept caused one authority to observe that 'more has been written on indubitable equivalence with less effect than on almost any

other area of the bankruptcy law.'" Jack Friedman, *What Courts Do to Secured Creditors in Chapter 11 Cramdown,* 14 Cardozo 1. Rev. 1495 (1993) citing Richard F, Broude, *Reorganizations under Chapter 11 of the Bankruptcy Code* 13–23 (1986).

▌ The issue whether a plan provides a secured creditor with the "indubitable equivalent" of its claim is both a question of law and fact. *See Arnold & Baker Farms v. United States ex rel. United States Farmers Home Admin. (In re Arnold & Baker Farms),* 85 F.3d 1415, 1421 (9th Cir.1996), *cert. denied, Arnold & Baker Farms v. United States,* 519 U.S. 1054, 117 S.Ct. 681, 136 L.Ed.2d 607 (1997). To determine whether the surrendering of collateral constitutes the "indubitable equivalent" of a secured claim the court must be placed in a position to determine the value of the collateral. The root of this problem stems in establishing a value for the real estate being surrendered. *See In re Walat Farms, Inc.,* 70 B.R. 330, 333 (Bankr.E.D.Mich.1987) ("The problem arises in determining whether the land offered is worth the amount of the claim. This is really more a practical than a theoretical problem. And the cause of the problem is the debate inherent in establishing a value for real estate"). Thus, when real property is surrendered in exchange for a secured claim, the court must take into account the value of the secured claim and the collateral, and whether such is undersecured or oversecured. It is important to emphasize that the indubitable equivalent analysis under section 1129(b)(2)(A)(iii) "... does not require that a creditor receive the indubitable equivalent of its entire claim, but only of its secured claim" *In re Arnold & Baker Farms,* 85 F.3d at 1423 citing *In re Sandy Ridge Dev. Corp.,* 881 F.2d 1346, 1350 (5th Cir.1989). Thus, a proposed plan that provides for both the surrender of all of a secured creditor's collateral and the allowance of any deficiency as an unsecured claim could satisfy the "indubitable equivalent" test. In *In re Arnold & Baker Farms,* the Ninth Circuit Court of Appeals analyzed the seminal case of *In re Sandy Ridge Dev. Corp.,* and stated the following:

> "*Sandy Ridge* explained that, in the case of an undersecured creditor, section 506(a) of the Bankruptcy Code bifurcates ... [the] total claim into secured and unsecured portions... In situations involving only one creditor and one debtor, the value of the undersecured creditor's secured claim is simply the value of the underlying collateral. The difference between the collateral's value and the amount of the debt becomes an unsecured claim and is added to the existing pool of unsecured claims." *Sandy Ridge,* 881 F.2d at 1349 (citations omitted). In other words, the value of the secured portion of an undersecured creditor's total claim is by definition equal to the value of the collateral securing it. Therefore, a creditor necessarily receives the indubitable equivalent of its secured claim when it receives the collateral securing that claim, regardless of how the court values the collateral. For this reason, the *Sandy Ridge* court did not need a judicial determination of value, explaining that 'for the present analysis, the exact value of [the collateral] is unimportant.' *Id.* at 1349. "The court's valuation of the collateral does, as Arnold and Baker observes, determine the amount of any remaining unsecured claim, but the Code requires only that the creditor receive the indubitable equivalent of its secured claim." *In re Arnold & Baker Farms,* 85 F.3d at 1423 citing *In re Sandy Ridge Dev. Corp.,* 881 F.2d at 1349.

The Fifth Circuit Court of Appeals in *In re Sandy Ridge* determined that the spe-

cific value of the real property at that juncture was irrelevant but that it may become important if the bankruptcy court had to determine the precise value of the bank's unsecured claim. *In re Sandy Ridge Dev. Corp.*, 881 F.2d at 1353–1354. The secured creditor in *Sandy Ridge* was undersecured and it was able to pursue the guarantors for the remaining unsecured claim.

 Thus, in the instant case determining whether the surrendering of the property constitutes the indubitable equivalent of PRLP's entire claim, as alleged by the Debtor, is in essence a valuation issue under 11 U.S.C. § 506 in which the court has to determine the value of the subject property. Determining the value of the subject property is critical in order to determine the allocation of the secured and unsecured portions of an allowed claim for plan confirmation purposes. Bankruptcy courts make determinations of value on a case-by-case basis considering the facts particular to each case and the competing interests of each case. *See In re Arnold & Baker Farms*, 177 B.R. 648, 655–656 (9th Cir. BAP 1994) citing H.R. Rep. 595, 95th Cong., 1st Sess. 356 (1977).

 The court notes that there is some confusion as to the term "dirt for debt" or partial "debt for debt" and how this term relates to whether the real estate collateral constitutes the "indubitable equivalent" of a creditor's secured claim. A Chapter 11 plan that proposes to surrender all or a portion of its collateral to satisfy its secured claim may be considered a "dirt-for-debt" scenario. The partial "dirt-for-debt" cases generally involve an oversecured creditor in which the debtor wants to surrender a portion of the collateral as the "indubitable equivalent" of the creditor's secured claim. "Thus, when a creditor is oversecured, a debtor cannot merely return a portion of collateral without other relief or a demonstration of value, as such collateral may not yield enough funds to reach the level of indubitable equivalence. When a debtor demonstrates sufficient value to satisfy a secured creditor's claim, then a partial surrender of collateral 'can provide an oversecured creditor with the "indubitable equivalent" of its claim.' *In re May*, 174 B.R. 832, 836–40 (Bankr.S.D.Ga.1994); *see, also, In re Atlanta Southern Business Park, Ltd.*, 173 B.R. 444, 449 (Bankr.N.D.Ga.1994). "In the current economic climate, chapter 11 plans providing for the full or partial surrender of collateral in satisfaction of a secured claim, also known as "dirt-for-debt" in real estate cases, have become commonplace. Since the seminal dirt-for-debt case of *Sandy Ridge Development Corp.*, was decided in 1989 during similar challenging economic times, several basic principles have emerged." David S. Jennis and Kathleen L. DiSanto, *Standards of Value in "Dirt–for–Debt" Chapter 11s: Don't Make a Rash Decision*, 31–3 ABU 48 (April 2012). The basic principles are the following: (i) "there is almost no dispute that surrender of some or all of the collateral securing a debt can constitute the indubitable equivalent for purposes of confirmation of a chapter 11 plan pursuant to § 1129(b)(2)(A) of the Bankruptcy Code;" and (ii) "virtually all courts agree that any valuation in the dirt-for-debt context should be conservative in order to avoid shifting undue risk of the market to the secured creditor. Beyond these basic concepts, however, there is some underlying (and often undiscussed) confusion as to the appropriate standard of value to be utilized in dirt-for-debt cases." *Id.* However, given the depressed real estate market in Puerto Rico it will be difficult for a partial "dirt-for-debt" proposed plan to provide the creditor with the "indubitable

equivalent" of its secured claim.[8] Therefore, Chapter 11 plans that propose to surrender all of the property as the indubitable equivalent need to be thoroughly analyzed and evaluated due to the depressed real estate market conditions.

■ In *In re Sandy Ridge Dev. Corp.* the plan proposed to surrender all the property to which the secured creditor's lien attached and thus, the surrendering of all the collateral was found to constitute the "indubitable equivalent" of its secured claim. Notwithstanding, the Fifth Circuit Court of Appeals concluded that the specific value of the real property at that juncture was irrelevant but that it may become important if the bankruptcy court had to determine the precise value of the bank's unsecured claim. A plan that proposes to surrender a portion (part) of the collateral in satisfaction of the secured claim is considered a "partial dirt-for-debt" plan and this type of plan will be closely scrutinized to insure that the creditor will actually receive the "indubitable equivalent" of its secured claim. *See In re Arnold & Baker Farms,* 177 B.R. at 660 ("It is apparent that a secured creditor who receives all of its collateral in satisfaction of its claim has received the indubitable equivalence of its secured claim (citations omitted). However, where the creditor is earmarked to receive part of its collateral, it will be a rare case in which the creditor

will have received the indubitable equivalent of its claim. Any such plan will be subject to extremely close scrutiny to insure that the creditor will actually receive the indubitable equivalent of its secured claim"). Irrespective of whether the proposed chapter 11 plan is a full or partial "dirt-for-debt" plan, it ultimately becomes a valuation issue which bankruptcy courts have addressed on a case-by case basis. *See In re Arnold & Baker Farms,* 85 F.3d at 1421. In the instant case, the valuation of the collateral is critical to the plan confirmation process because the secured creditor could be left with a large unsecured deficiency claim resulting in the control of the general unsecured class (at least in monetary amount) and thus blocking this class from accepting the proposed plan.

*11 U.S.C. § 506(a) and the Valuation Issue*

Section 506(a)(1) provides:

"[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such

---

**8.** "One context in which the indubitable-equivalent standard and the increasingly inexact nature of real property valuation collide head on is in a 'dirt-for-debt' chapter 11 plan. As developers and other holders of vast amounts of real estate find themselves looking to chapter 11 for relief from the current deflationary real estate market, dirt for debt plans are becoming more common as debtors have fewer means to implement a chapter 11 plan—and for good reason. These plans, if confirmed, allow debtors to hand over less than all of a secured creditor's collateral while satisfying the entire secured claim. In

the mid—to late 90s, this was fine, as real estate values were stable and a bankruptcy court could make a reasonable finding that a portion of a creditor's collateral did provide the creditor with the indubitable equivalent of its claim. However, with real estate values now steadily decreasing, and with our ability to ascertain value severely enfeebled, such findings are all but impossible." Ron C. Bingham II & D. Cooper Robertson, Reconciling "Dirt-for Debt" Plans with "Indubitable Equivalent" Standard, 28–8 ABU 36 (October 2009).

creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C. § 506(a)(1).

The amount of any claim secured by collateral has been described as "something of a moving target" because property may be valued in different ways depending on the context of the valuation. *See* Alan N. Resnick & Henry J. Sommer, 4 *Collier on Bankruptcy* ¶ 506.03[7][f] (16th ed. 2014).[9] "The courts have virtually uniformly recognized that the value of property securing a claim, and thus the allowed amount of the secured claim, may change during the course of a bankruptcy case. Accordingly, the extent to which an allowed claim constitutes secured claim may vary during the course of the proceedings. The principal causes of variance include (1) payments made during the course of the bankruptcy case in reduction of the secured claim of a senior lienholder, (2) fluctuations in the value of the collateral for market reasons and (3) changes in the applicable method of valuation as required by section 506(a)" *Id.; See also Prudential Ins. Co. of Am. v. SW Boston Hotel Venture, LLC (In re SW Boston Hotel Venture, LLC)*, 748 F.3d 393 (1st Cir.2014) agreeing that bankruptcy courts may adopt a flexible approach regarding valuation and also as to the measuring date of the valuation.

█ Section 506(a) provides in pertinent part that: "[s]uch value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C. § 506(a). In the instant case, the valuation of the subject property is critical in determining the amount of the secured creditor's claim under the cramdown provision for plan confirmation purposes. Thus, the collateral should be valued as of the effective date of the plan. *See* Alan N. Resnick & Henry J. Sommer, 4 *Collier on Bankruptcy* ¶ 506.03[10] (16th ed. 2014); *In re Atlanta S. Business Park*, 173 B.R. 444, 449–450 (Bankr.N.D.Ga. 1994). The valuation component is essential given that the Supreme Court has explained that: "[section 506(a)] tells us that a secured creditor's claim is to be divided into secured and unsecured portions, with the secured portion of the claim limited to the value of the collateral." *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148, 37 C.B.C.2d 744 (1997). However Section 506(a) does not provide a specific valuation method or standard of value to be used when valuing property subject to lien and this creates some confusion in the process of somehow incorporating the appraisal methodology into the bankruptcy context.

9. "For example, particularly in the chapter 11, 12, or 13 context, the amount of a single item of property may be valued in different ways depending on the context of the valuation. At the outset of a case, the secured claim might be fixed at one amount in connection with a request for adequate protection or relief from stay. Later on, it might be fixed at another amount in connection with a determination of whether the creditor is adequately protected if a senior or equal lien is granted to a postpetition lender pursuant to section 364(d). Later still, the claim might be fixed at yet another amount in connection with a proposed disposition of the collateral, and at still another amount for purposes of a plan." Alan N. Resnick & Henry J. Sommer, 4 *Collier on Bankruptcy* ¶ 506.03[7][f] (16th ed. 2014).

The proponent of a Chapter 11 plan bears the burden of establishing that the plan meets all of the requirements pursuant to Section 1129(a) and (b). *See* Alan N. Resnick & Henry J. Sommer, 4 *Collier on Bankruptcy* ¶ 506.03[9] (16th ed. 2014). The plan proponent has the burden of proving by a preponderance of the evidence that the plan satisfies the applicable requirements *See Irving Tanning Co. v. Me. Superintendent of Ins.*, 496 B.R. 644, 658 (1st Cir. BAP 2013) citing *In re Salem Suede, Inc.*, 219 B.R. 922, 932 (Bankr. D.Mass.1998).

In this case, the Debtor requested a valuation hearing in order for the court to determine the value of the collateral which it plans to surrender to the secured creditor. The Debtor is not liquidating the subject property but· rather surrendering the property to PRLP, giving it "deeds in lieu of foreclosure." *See In re Immanuel LLC*, 2011 WL 938410, *2, 2011 Bankr. Lexis 1015, *7 (Bankr.W.D.Mich.2011).

*Valuation Standards and Appropriate Appraisal Methodology*

At this juncture, the court has been requested by the parties to determine the appropriate appraisal methodology which was thoroughly discussed at the valuation hearings by the three (3) real estate appraisers and to also determine the value of the subject property. Valuation is an inexact science and the chance of error always exists. Thus, a conservative approach to valuation has been favored by bankruptcy courts. In the instant case, the chance of error is evinced by the different market values for the same subject property by three (3) real estate appraisers. Consequently, a conservative approach in Chapter 11 plans in which the debtor proposes to surrender the collateral to the secured lender (creditor) is appropriate because the debtor shifts the burden of selling the property to the lender, the lender (secured creditor) will not earn interest during the pendency of the sale, and the chance of error in the valuation process always exists. *In re Simons*, 113 B.R. 942, 947 (Bankr.W.D.Tex.1990); *In re Atlanta S. Business Park*, 173 B.R. 444, 450 (Bankr. N.D.Ga.1994); *In re Sailboat Properties, LLC*, 2011 WL 1299301, *2, 2011 Bankr. Lexis 1316, *4 (Bankr.E.D.N.C.2011). *In re Grind Coffee & Nosh, LLC*, 2011 WL 1301357, *6, 2011 Bankr. Lexis 1335, *17–18 (Bankr.S.D.Miss.2011). In *In re Grind Coffee & Nosh, LLC*, the bankruptcy court stated the following regarding the uncertainty in the valuation process and conflicting appraisal testimony:

"Valuation of property is not an exact process and courts are often greeted with conflicting appraisal testimony, to which weight must be assigned depending upon the credibility assessments. As one court noted:

'Valuation outside the actual market place is inherently inexact.' *Rushton v. Commissioner*, 498 F.2d 88, 95 (5th Cir.1974). *See also Boyle v. Wells (In re Gustav Schaefer Co.)*, 103 F.2d 237, 242 (6th Cir.), cert. denied, 308 U.S. 579, 60 S.Ct. 96, 84 L.Ed. 485 (1939) ("The valuation of property is an inexact science and whatever method is used will only be an approximation and variance of opinion by two individuals does not establish a mistake in either."); *In re Montgomery Court Apartments of Ingham County, Ltd.*, 141 B.R. 324, 337 (Bankr.S.D.Ohio 1992) ("Valuations of real property, like projections of income and expenses, are inherently imprecise. Opinions realistically may differ, depending upon the method of valuation used and the nature of assumptions adopted."); *In re Jones*, 5 B.R. 736, 738 (Bankr.E.D.Va.1980) ("True value is an elusive Pimpernel."). Because

the valuation process often involves the analysis of conflicting appraisal testimony, a court must necessarily assign weight to the opinion testimony received based on its view of the qualifications and credibility of the parties' expert witnesses. *See In re Coates,* 180 B.R. 110, 112 (Bankr.D.S.C.1995) ("The valuation process is not an exact science, and the court must allocate varying degrees of weight depending upon the court's opinion of the credibility of . . . [the appraisal] evidence."). *In re Smith,* 267 B.R. 568, 572 (Bankr. S.D.Ohio 2001); *Anderson v. Mega Lift Sys., L.L.C. (In re Mega Sys., L.L.C.),* No. 03–60190, Adv. No. 04–6085, 2007 Bankr. Lexis 1957, 2007 WL 1643182, at *8 (Bankr.E.D.Tex. June 4, 2007) (valuation of property is inherently imprecise and often involves conflicting appraisal testimony); *In re Brown,* 289 B.R. 235, 238 (Bankr.M.D.Fla.2003) "(valuation of assets is not an exact science and has inherent vagaries)." *In re Grind Coffee & Nosh, LLC,* [2011 WL 1301357, *6] 2011 Bankr. Lexis 1335, *17–18.

The bankruptcy court in In *In re Grind Coffee & Nosh, LLC* also discussed the reasons why bankruptcy courts may form their own opinion as to the value of a property by stating as follows:

"The bankruptcy court is not bound by valuation opinions or reports submitted by appraisers, and may form its own opinion as to the value of property in bankruptcy proceedings. *See Patterson v. LJR Invs., LLC (In re Patterson),* 375 B.R. 135, 144 (Bankr.E.D.Pa.2007): *see also In re Barbieri,* No. 00–22274–478, 2009 Bankr. Lexis 4095, 2009 WL 5216963, at *10 (Bankr.E.D.N.Y. Dec. 29, 2009); *In re Smith,* 267 B.R. at 572–74. The Court may accept an appraisal in its entirety or may choose to give weight only to those portions of an appraisal that assist the Court in its determination. *See In re Brown,* 289 B.R. 235, 238 (Bankr.M.D.Fla.2003). '[W]hen competing appraisals are submitted, the court is required to consider portions of each to arrive at what it believes to be a realistic market value for the property.' *In re Belmont Realty Corp.,* 113 B.R. 118, 121 (Bankr.D.R.I.1990). Heightened scrutiny is appropriate when two competent appraisals are presented by qualified appraisers stating widely divergent values. *See In re Jones,* No. 03–84129, 2004 Bankr. Lexis 143, 2004 WL 298612, at *3 (Bankr.C.D.Ill. Feb. 5, 2004); *see also In re Gauthier,* No. 08–51002, 2009 Bankr. Lexis 2284, 2009 WL 2226106, at *1 (Bankr.W.D.La. July 16, 2009) (court noted that valuation was complicated by lack of reliable comparable sales data). Courts must be wary of appraisals which contain unsupported but important assumptions, valuations which place property with a unique and extraordinary location on par with an ordinary lot, and comparable sales that are so dissimilar that they are of little use in supporting the opinion of value. *See In re Belmont Realty Corp.,* 113 B.R. at 119–21." *In re Grind Coffee & Nosh, LLC,* [2011 WL 1301357, at *6] 2011 Bankr. Lexis 1135, at *18.

This court, conscious of its discretion and responsibility, must base its determination on the experts' testimonies. The real estate appraiser's independence in valuation is key, given that "[t]he work of an appraiser is to provide an unbiased assessment of the value of the property. That assessment may be used in various contexts and for different purposes. The value of the collateral must be determined in light of the purpose of the valuation and of the proposed disposition or use of the collateral." *Henderson v. Cmty. Bank (In re Evans),* 492 B.R. 480, 507–508 (Bankr. S.D.Miss.2013) citing *Fin. Sec. Assurance*

*Inc. v. T–H New Orleans Ltd. P'ship (In re T–H New Orleans Ltd. P'ship)*, 116 F.3d 790, 797 (5th Cir.1997); *In re Gauthier*, No. 08–51002, 2009 Bankr. Lexis 2284, 2009 WL 2226106, *1 (Bankr.W.D.La. 2009). USPAP defines value as: "the monetary relationship between properties and those who buy, sell, or use those properties. *Comment:* Value expresses an economic concept. As such, it is never a fact but always an opinion of the worth of a property at a given time in accordance with a specific definition of value. In appraisal practice, value must always be qualified—for example, market value, liquidation value, or investment value." (USPAP 2014–2015, pg. U–4). In the instant case, all three (3) real estate appraisers agree that the type of value that should be employed regarding the subject property is market value. However, it is important to note that Mr. Gaztambide in his appraisal report stated that his opinion was of the "As Is" Market Value for the residential units of the subject which were valued using the Market or Sales Comparison Approach. Mr. Gaztambide did not discount any holding costs or expenses from these units nor did he apply a present value discount factor. He made adjustments to the comparable sales depending on whether the comparable sales were superior or inferior when compared to the subject property. Mr. Gaztambide used the income approach for the two (2) commercial locales.

The testimonies of the real estate appraisers are in agreement that there are three (3) recognized methods for valuing real estate pursuant to Rule 1–4 of USPAP, namely: (i) the sales comparison approach; (ii) the cost approach; and (iii) the income capitalization approach. "Considered in isolation, these approaches generally do not establish the value of property; rather, value is 'the product of a reconciliation of the indications yielded by the three approaches.'" *Henderson v. Cmty. Bank (In re Evans)*, 492 B.R. at 489–490 citing *Rebelwood, Ltd. v. Hinds County*, 544 So.2d 1356, 1360 (Miss.1989).

All three (3) real estate appraisers agree that the highest and best use of the subject property is to continue the sale of the residential units and of the two (2) commercial units to end users. The fact that the subject property will be surrendered to the secured creditor (PRLP) as opposed to the Debtor or any other person or entity, does not alter the subject property's highest and best use. *See In re Peerman*, 109 B.R. 718, 721 (Bankr. W.D.Tex.1989). A creditor's intended use for a property does not alter the standard of valuation or the highest and best use of the subject property.

Both Mr. Vallejo and Mr. Bonnin valued the subject property at market value as of the effective date of their respective appraisal reports. Mr. Vallejo's and Mr. Bonnin's appraisal reports both have the same definition of market value [10] (Exhibit

10. "Market value is defined as the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised and acting in what they consider their best interests; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated

C–5 and Exhibit D–24 and D–25). The court, after hearing the testimonies from the three (3) real estate appraisers, determined that the proper valuation methodology for the properties to be surrendered to PRLP was the market value to a single purchaser or bulk value. The court notes that Mr. Vallejo prepared two (2) appraisal reports in the narrative summary format for the years 2012 and 2013 (exhibits D–23 and D–24). In the year 2014, Mr. Vallejo prepared a restricted appraisal report of the 15 unsold residential units and the 13,815 square feet ground floor commercial space under the sale valuation procedures performed in the September 10, 2013 appraisal report (Exhibit D–25). Mr. Vallejo prepared an updated chart in which he recalculated the value to a single purchaser (bulk value) because the retail values of the residential units (or the asking prices/ price list) had been lowered by the Debtor (Exhibit D–27(b)).

The Debtor argues in its memorandum that when the complete collateral is to be surrendered as the indubitable equivalent, the applicable Appraisal Standards and Guidelines provide that the appropriate methodology that should be employed is the aggregate of the "fair market value" of the individual units of the collateral, to which some administrative expenses need to be discounted from the value, and not the "value to a single purchaser" or "bulk value" methodology in which certain expenses and profit are deducted to reduce the fair market value considerably. In the instant case, the court concluded that the aggregate of the fair market values of the 15 residential units using the sales comparison approach plus the values obtained for the two (2) commercial spaces through the income approach did not provide the market value for the subject property because under the Chapter 11 plan provision with the sale" (Exhibit C–5, pg. 8), (Exhibit

scenario selected by the Debtor, the subject property will not be surrendered by its individual units (unit by unit), it will be surrendered to the secured creditor in bulk or (to a single purchaser). Mr. Gaztambide testified that he prepared his appraisal report to determine the individual values of the 15 residential units and the 2 commercial units. He stated that he was not retained to determine the best methodology to determine the market value of the subject property, meaning the 15 residential units and the 2 commercial units. Mr. Gaztambide stated that it was his best recollection that he became aware that the plan proposed to surrender all of the property (meaning the 15 residential units and the 2 commercial units) to PRLP after he had prepared his report. Mr. Gaztambide in his appraisal report under the "Identification of the Appraisal Problem" section stated that, "[t]he purpose of this appraisal is to form an opinion with respect to the "As Is" Market Value of the 15 unsold residential condominium units and the 2 commercial locale[s] part of Metro Plaza Towers Condominium. The intended use of this appraisal is to serve as a basis for bankruptcy proceedings. Under this scenario, our client will not require a Fundamental Analysis. Inferred Analysis is the level required for appraisal assignments and was developed for this appraisal." (Exhibit D–29, pg. 14).

■ This court finds that the scope of work that Mr. Gaztambide employed in his appraisal report is not aligned with the transaction that is being considered in the instant case, which is that the subject property that consists of a group of 15 residential and 2 commercial units in a completed condominium pursuant to the Debtor's proposed plan will be surrendered as the "indubitable equivalent" of

D–24, pg. 8).

PRLP's secured claim as part of a cramdown of a secured creditor within a bankruptcy proceeding. In simple terms, the intended use of the subject property is that it will be surrendered in bulk to the creditor in a bankruptcy proceeding. Thus, there is a disconnect in the actual intended use of the appraiser's opinions and conclusions which is collateral proposed to be surrendered in a bankruptcy proceeding to a secured creditor and the intended use employed by Mr. Gaztambide in his assignment, which was more aligned with the client's objective of individual valuation of the units. Mr. Gaztambide testified that the client requested individual valuation of the units. Mr. Gaztambide's engagement letter clearly states under the heading, *Type and Definition of Value,* that his assignment is, "[t]o render an opinion of the Individual Market Value of the referenced units of the subject; as defined by the Appraisal Institute and the Appraisal Standards Board of the Appraisal Sub-committee of the Federal Financial Institution Examination Council." Under the heading, *Use of the Appraisal,* it states that: "[t]he appraisal report will be prepared following the acceptable techniques of the Appraisal Institute, the Puerto Rico Institute of Appraisers, and the Commonwealth of Puerto Rico Real Estate Appraisers Board of Examiners. However, market, and/or financial feasibility studies are beyond the scope of this assignment. Demand–Supply within the context of the appraisal will be based on an inferred analysis." (Exhibit C–23). As such in his appraisal report, the conclusion of value for the 15 unsold residential condominium units is the "As Is" market value as of the effective date which is the aggregate market value of $5,895,000. The conclusion of value for the commercial component is the aggregate market value of $1,530,000 (Exhibit D–29, pgs. 5–6).

Mr. Gaztambide in his appraisal report included the following extraordinary assumptions (Exhibit D–29, pg. 18):

"[t]he appraisers assumes that the 15 existing unsold residential units subject of this valuation should be delivered in approximately 30 months (0.5 unit per month); and that the 2 commercial locale should be deliver[ed] in 18 months (Ponce De Leon Unit in 9 months and Ribot Unit in 18 months); under professional marketing. This is duly supported by market evidence and based on stability or slow recovery of the local economy during that period." (Exhibit D–29, pg. 18).

An extraordinary assumption is defined as:

"an assumption, directly related to a specific assignment, as of the effective date of the assignment results, which, if found to be false, could alter the appraiser's opinions or conclusions. *Comment:* Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property; such as market condition or trends; or about the integrity of data used in an analysis." (USPAP 2014–2015, pg. U–3).

Mr. Gaztambide's appraisal report does not state the effect this particular extraordinary assumption would have on the assignment results (*See* USPAP 2014–2015, pg. U–24).

In view of the foregoing, the court declines to base its conclusions of value following Mr. Gaztambide's appraisal. The same is based on circumstances different from the applicable scenario in this case.

■ Mr. Bonnin and Mr. Vallejo both employed the market value to a single purchaser (bulk value) to determine the

market value of the subject property. These two real estate appraisers were unable to directly apply the sales comparison approach to the subject condominium units in bulk as no comparable bulk sales of condominium units were available. Both appraisers employed the sales comparison approach to the residential units less holding costs and expenses (inclusive of entrepreneurial profit) and then applied a discount to calculate the present value. The income approach was used for the two (2) commercial locales. Mr. Vallejo in his September 10, 2013 appraisal report stated that: "[t]he purpose of this appraisal, as per your instructions, was to arrive at the aggregate retail values and at the discounted value and/or value to a single purchaser, of the 20 unsold residential apartment units, the 13,815 square foot unsold commercial ground floor space and the 160 public parking spaces at the Metro Plaza Towers Condominium Project, subject to the assumptions, limiting conditions and certification included herein, as of September 10, 2013" (Exhibit D–24). Mr. Vallejo's appraisal report stated that the intended use of the report "is to assist you (the client) in a decision making process referent to the subject's property's bankruptcy proceedings" (Exhibit D–24). Both Mr. Vallejo and Mr. Bonnin agree that the aggregate of retail values does not constitute an opinion of value. The aggregate retail value does not constitute an opinion of market value because it assumes that the units would be sold individually, not in bulk. In the instant case, the transaction that is being proposed is that the Debtor plans to surrender the subject property in bulk to the secured creditor. The units are not being sold or surrendered individually; rather they are being surrendered in bulk (15 residential units and 2 commercial locales) to the secured creditor. The underlying transaction and the highest and best use of the subject property are two different concepts, both of which affect market value. The highest and best use of the subject property is independent of the underlying transaction that is taking place in this case—the surrendering in bulk of the subject property to the secured creditor.

The aggregate of retail value ("ARV") is the sum of the appraised values of the individual units in a portfolio of properties as of the date of valuation.[11] In Mr. Bonnin's appraisal report he defines the term market value to a single purchaser (bulk value) as:

"This figure represents a concept of time preference, which holds that future income or benefits are worth less than the same income or benefits now, and that they decrease in value systematically as the time of their receipt is further deferred into the future. Typically, marketing, overhead (if applicable), legal fees (if applicable), taxes (if applicable),

---

11. Mr. Bonnin in his appraisal report defined aggregate of retail values (ARV) as: "[t]he sum of the appraised values of the individual units in a subdivision, as if all of the units were completed and available for retail sale, as of the date of the appraisal. The sum of the retail sales includes an allowance for lot premiums, if applicable, but excludes all allowances for carrying costs." (Exhibit C–5). Mr. Vallejo in his appraisal report defined aggregate of retail values as: "[t]his figure represents the total potential retail income that is expected to be generated from the sale of the 20 unsold residential units, the 13,815 square feet commercial ground floor space and the 160 public parking spaces at their current individual values. It is defined as the sum of the separate and distinct market value opinions for each of the units/locales/spaces in a condominium, subdivision development, or portfolio of properties, as of the date of valuation. The aggregate of retail values does not represent an opinion of value; it is simply the total of multiple market value conclusions" (Exhibit D–24).

construction loan interest (if applicable) and sales expenses, in addition to expected entrepreneurial profit, are subtracted from the aggregate of retail values of the project. The resulting cash flows are then discounted to present value using an appropriate discount rate. Otherwise, a discount rate inclusive of profit can be used without entrepreneurial profit deducted as a line item expense. The resulting value is representative of the market value of the project, to a single purchaser, as of the effective date of the appraisal. This is also referred to as the bulk value." (Exhibit C–5, pg. 9).

Mr. Vallejo's revised figures were the following: gross residential retail value in the amount of $5,185,000 for the 15 unsold residential units as per the asking prices and the gross commercial retail value in the amount of $1,900,000 for a total aggregate retail value (rounded) of $7,085,000 (Exhibit D–27(a)). Mr. Gaztambide's aggregate market value of the residential units was $5,895,000 and the conclusion of value for the commercial component was $1,530,000. Mr. Vallejo's value to a single purchaser of the subject property was in the amount of $4,950,000. This market value figure was not divided amongst its residential and commercial components (Exhibit D–27(b)). Mr. Bonnin's figures pursuant to his appraisal report were the following: gross residential retail value in the amount of $4,705,000 for the 15 unsold residential units as per the asking prices and the gross commercial retail value in the amount of $1,700,000 for a total aggregate retail value (rounded) of $6,405,000 (Exhibit C–5, pgs. 54, 68). Mr. Bonnin's value to a single purchaser of the subject

property was in the amount of $4,300,000 of which $3,300,000 was allocated to the residential component and $1,000,000 to the two commercial locales (Exhibit C–5).

One of the main differences in the conclusions of market value of Mr. Vallejo and Mr. Bonnin is the value assigned to the commercial locales. Mr. Vallejo's appraisal report was revised to include the additional parking spaces that were assigned to each commercial locale (17 additional spaces were allocated to the locale facing Ribot Street and 19 additional parking spaces were allocated to the locale facing Ponce de León Avenue) and the additional area that was allotted to the commercial locales. Mr. Vallejo concluded that if Mr. Bonnin's appraisal report is adjusted to reflect the additional area and parking spaces for the two (2) commercial units, the conclusion of value would be higher and in general terms consistent with his conclusion and once you discount that higher figure it is most probable that the discounted value of the property would also be consistent and higher of the value conclusion. This court finds that Mr. Bonnin's conclusion of market value of $1 million for the two (2) commercial locales is undervalued (on the low end) as there is currently a letter of intent of $1 million to purchase the commercial locale facing Ponce de León Avenue. Thus, this court concludes that Mr. Vallejo's opinion of market value to a single purchaser (bulk value) for the two (2) commercial locales is more accurate than the other two (2) appraisal reports that were submitted to this court by Mr. Gaztambide and by Mr. Bonnin. Mr. Vallejo's opinion of market value for the commercial component was $1,334,328,[12] and for the residential compo-

---

12. The court obtained this figure ($1,334,328) for the two (2) commercial locales by using Mr. Vallejo's chart (Exhibit D–27(b)) and applying to the gross commercial values the different expense items (holding costs), including the profit component and the present value factor for the first and fifth quarter to

nent the value was $3,614,178.[13] Thus, this court finds that the market value to a single purchaser (bulk value) for the two (2) commercial locales is $1,334,328.

The other significant difference between Mr. Vallejo's conclusion of market value and Mr. Bonnin's conclusion of value was the market value for the residential units. Mr. Vallejo's market value for the 15 units was $3,614,178. Mr. Bonnin's market value for the residential units was $3,300,000. The difference in the conclusion of values for the residential units is mostly due to a $418,000 difference in the aggregate retail values assigned to the penthouse units (Exhibit C–13, Comparison of Appraisal Parameters). There is only a $60,000 difference in the aggregate retail values assigned to the typical residential units (Exhibit C–13). Of the 15 unsold residential units, 7 are penthouse units. Mr. Bonnin stated that this marked difference in the aggregate retail values of the residential units is because he further reduced the price of the penthouse units because only one (1) penthouse unit has been sold in six (6) years. This indicates that the market has not accepted the list (asking) price for the penthouse units. The penthouse sale took place in September of 2013 and sold at $149 per square foot. The current developer net price is at $137 per square foot which is an 8% reduction in price and matches the values by Mr. Vallejo. Mr. Bonnin explained that Mr. Vallejo applied an 8% discount to both the typical residential and the penthouse units. He opined that an 8% price reduction is not enough to generate penthouse sales because if the developer is reducing by 8%, the prices of the typical units that are selling and is also reducing the penthouses by the same percentage this is not going to motivate penthouse sales. However, Mr. Bonnin explains that the penthouse units have to be discounted more than the typical units because they are not selling and thus he applied a 20% discount from the current asking prices which resulted in a value indication of $120 per square foot for the penthouse units.

This court finds that Mr. Bonnin's market value to a single purchaser (bulk value) of $3.3 million of the unsold residential units is more reasonable because he applied a greater discount to the list (asking) price because 7 of the 15 residential units are penthouse units, and only one (1) penthouse unit has been sold in the last six (6) years. This court concludes that a higher discount rate on the list prices is justified to account for the risk of absorption (meaning that the absorption period is longer than what was forecasted) and the risk of further decreasing prices which will be assumed by the secured creditor in the instant case. This court considered Mr. Bonnin's gross residential value of $941,000 per quarter (as opposed to Mr. Vallejo's $1,037,000 gross residential value per quarter) for the residential units for the five quarters using Mr. Vallejo's expenses and present value rates as listed in Exhibit D–27(b), and the figure obtained was in the amount of $3,279,542.14, which is slightly less than Mr. Bonnin's $3.3 million dollar market value for the residential units.

The Debtor argues that the entrepreneurial profit or profit component which both Mr. Vallejo and Mr. Bonnin

the commercial locales as provided by Mr. Vallejo.

13. The court obtained this figure ($3,614,178) for the residential units by also using Mr. Vallejo's chart (Exhibit D–27(b)) and applying

to the gross residential values the different expense items (holding costs), including the profit component and the present value factor for all the quarters to the residential units as provided by Mr. Vallejo.

employed in their computation to derive market value to a single purchaser (bulk sale) must be excluded. Mr. Bonnin clarified during the valuation hearing that there are two (2) ways to account for the discount rate and profit. One way is to do it in a split way which is the method that Mr. Vallejo used or use a yield rate that includes profit. Mr. Bonnin explained that Mr. Vallejo used the split method of profit and discount rate which provides for the same net discount as his methodology of applying a 25% discount inclusive of the profit component. The Debtor in its memorandum argues that the profit component should be excluded because "[a]s in *Sailboat* we conclude that the inclusion of a profit component is inappropriate in this case when the project is completed and 91% sold. The case law includes that the profit component is used if the property's highest and best use is to be sold in bulk lots, not individual sales. The risk is borne by the secured creditor and any discount on account of their choice to dispose of the property must not interfere with a determination of the highest and best use of the property for valuation purposes." (Docket No. 404, pg. 49).

*In re Sailboat Properties, LLC,* cites *In re Bannerman* because the bankruptcy court excluded the entrepreneurial profit component from the calculation of market value. In *In re Bannerman Holdings, LLC,* 2010 WL 4260003, *6, 2010 Bankr. Lexis 3752, *19 (Bankr.E.D.N.C.2010) the court held that entrepreneurial profit should be excluded based on expert witness testimony that such exclusion would be appropriate because the surrendered units are fully completed and will be sold individually (not in bulk to a developer). The court determined that:

"At the hearing, Mr. Wilkinson [real estate appraiser] testified that an entrepreneurial profit discount would only be appropriate if the units were sold in bulk

to a developer. SunTrust has not yet committed to a marketing plan, but it appears more likely than not that the surrendered units will be sold individually. Mr. Wilkinson [real estate appraiser] acknowledged that selling the units individually would be a realistic option and Mr. Ingram [real estate appraiser] opined that individual sales would be the more probable route. Mr. Scott Lindsay testified that SunTrust was working on a financing package to offer to prospective purchasers of individual units. SunTrust objected to the plan on the basis that it subjected SunTrust to competition with the debtor on the sale of the units, which also tends to show an intent by SunTrust to market the units individually.

Finally, SunTrust introduced documentary evidence of government-imposed appraisal requiring bulk sale analysis when more than four units are involved. The court is not compelled to follow these regulations when determining value and chooses not to do so in light of the more probable disposition of the property. In recognition of SunTrust's option to market and offer financing on the property as single units and the fact that all improvements to the property have been completed, a discount for an entrepreneurial profit would be inappropriate." *In re Bannerman Holdings, LLC,* 2010 WL 4260003, *6, 2010 Bankr. Lexis 3752, *1.

The bankruptcy court in *In re Sailboat Properties, LLC* excluded the profit component from the calculation of market value based upon the same reasons as in *In re Bannerman Holdings, LLC,* namely; the project is complete meaning that no further construction is required to complete the property for sale and the highest and best use of the property is to sell individual units to individual purchasers.

In *In re Bannerman Holdings, LLC* both appraisers included an entrepreneurial profit discount in their respective written appraisals. However, the debtor's appraiser testified that, "...although he included a discount for entrepreneurial profit in his written appraisal, he does not think it is appropriate because the project is complete." *In re Sailboat Properties, LLC,* 2011 WL 1299301, *4, 2011 Bankr. Lexis 1316, *11 (Bankr.E.D.N.C.2011). The facts of this case are different, although the project is completed, the units will not be sold individually.

It is noteworthy that six months after the decision of the case of *In re Sailboat Properties LLC,* was rendered, the United States District Court for the Eastern District of North Carolina, Southern Division vacated the bankruptcy court's order confirming the debtor's Chapter 11 plan in *In re Bannerman Holdings, LLC* because it had substantial doubt that the value of the property that was going to be surrendered was the indubitable equivalent of the creditor's secured claim. The district court was troubled by the fact that the bankruptcy court made significant adjustments to the appraisal evidence due to the fact that the appraisal evidence presented in *In re Bannerman* was wide-ranging and thus indicative of uncertainty in the value of the property [14]. The District Court for the Eastern District of North Carolina, Southern Division concluded that the complete exclusion of any entrepreneurial profit further increased the risk that the secured creditor would not be fully compensated on its secured claim. The District Court stated as follows:

"Finally, the bankruptcy court eliminated the discount for entrepreneurial profit. The bankruptcy court found that an entrepreneurial discount was inappropriate given that SunTrust had the option to market and offer financing on the condominiums as single units as opposed to selling them in bulk to an investor. (Conf. Order at 12–13.) At the confirmation hearing, SunTrust had not committed to a marketing plan, but the bankruptcy court found it more likely than not that the surrendered units would be sold individually. (*Id.* at 12.) Based on the appraisers testimony at the confirmation hearing with respect to entrepreneurial profit, were SunTrust to now sell the condominiums in bulk, it would most certainly be at values less than that calculated by the bankruptcy court:

'Well, the entrepreneurial profit is the incentive to make someone come out and buy all of these units. You know, this a three-and-a-half-million dollar purchase. In order to encourage someone to put that kind of money down and then handle the risk of selling out the units, as we've seen through our absorption projections, it's pretty hit and miss how quickly these units sell so there is some significant risk to that. And that 15 percent [entrepreneurial discount] we make the assumption would be enough to compensate an individual to come in and buy the bulk number of units

reflect the value of only the units to be surrendered by the debtor.' (Conf. Order at 9); (2) excluded or discounted three of the five comparables used in the appraisal (*id.* at 10–11); and (3) eliminated a discount for entrepreneurial profit (*id.* at 12).'' *In re Bannerman Holdings, LLC,* 2011 U.S. Dist. Lexis 153502, *14–15 (Bankr.E.D.N.C.2010).

14. In addition to the fact that the valuation evidence presented to the bankruptcy court was wide-ranging, the bankruptcy court made material adjustments to the appraisal evidence. The bankruptcy court took the average unit price of $370,000 from Worsley's corrected appraisal, then (1) 'adjust[ed] the findings detailed in the appraisal reports to

and then handle the sales process. (Aug. 26, 2010 Conf. Hr'g at 47–48.)' The complete exclusion of any entrepreneurial discount further increased the risk that SunTrust would not be fully compensated on its secured claim. *See In re Arnold & Baker Farms,* 85 F.3d at 1422 ("If [the creditor] subsequently sells the property for less than the value calculated by the bankruptcy court, [the creditor] has no recourse to the remaining collateral to satisfy the deficiency. As a result, the distribution to [the creditor] may not be 'completely compensatory.'") *In re Bannerman Holdings, LLC,* 2011 U.S. Dist. Lexis 153502, *17–19.

In the instant case, both Mr. Vallejo and Mr. Bonnin deducted a profit component to derive the market value to a single purchaser (bulk value) of the subject property. Neither real estate appraiser testified that the profit component deduction should be excluded given that the project was complete and the residential units will be sold individually to individual purchasers. Mr. Vallejo testified that the market value of the subject property is $4,950,000 and any factor that is taken out of his calculation or methodology would affect the market value opinion. He stated that the profit line item could be eliminated but then one would have to increase the discount rate to incorporate the profit into the discount rate but you would have to consider profit. He stated that the risk of a longer absorption rate and price reduction is a buyer's risk and one always looks at market value from the shoes of the buyer. Mr. Vallejo further testified that Mr. Bonnin used a 25% discount rate, profit included and his discount rate was 20% plus the 12% profit to account for the period it would take to sell the property and bring the proceeds to their present worth. This court concludes that it is not appropriate to exclude the profit compo-

nent discount, given that the resulting figure would not result in the market value to a single purchaser (bulk value) of the subject property. Neither Mr. Vallejo or Mr. Bonnin opined that the exclusion of the profit component was a function/ correlation (or in some way related) to whether a project was completed, whether the individual units would be sold to individual purchasers or in bulk to an investor or to the highest and best use of the subject property.

*Conclusion*

■ In summary, this court concludes that the market value to a single purchaser (bulk value) of the subject property in controversy is $4,634,328 which is comprised of $3.3 million for the residential units and $1,334,328 for the two (2) commercial locales.

PRLP's amended proof of claim # 7–2 lists its claim as of the petition date in the amount of $14,496,907.24. PRLP in its proof of claim references the Annex for certain line items such as the value of property, amount of the secured claim and the amount unsecured. In the *Annex to Proof of Claim,* PRLP discloses that it filed this supplement to the claim to submit the revised amount of its claim as of March 25, 2014 the total amount of $6,376,980.54 which consists of the following components: (i) $5,645,089.73 in principal; (ii) $488,949.53 in accrued interest; (iii) $202,529.50 in legal fees; and (iv) $40,411.78 in other costs (Claims Register, proof of claim # 7–2, Exhibit A). This court has determined that the market value of the subject property as of the confirmation date is $4,634,328 which is approximately $1,010,761 less than the amount of PRLP's principal ($5,645,089.73), thus, PRLP will be left with a deficiency or an unsecured claim, irrespective of the amounts ultimately determined for inter-

est, fees, and costs.[15] Consequently, the Debtor's proposed surrendering of the subject property does not constitute the indubitable equivalent of PRLP's claim (entire), as the market value of the subject property is approximately $1 million dollars ($5,645,089.73 − $4,634,328 = $1,010,761.73) below PRLP's principal, exclusive of legal fees, accrued interest and other costs.

In view of the foregoing, confirmation of the Debtor's Amended Plan of Reorganization Dated January 25, 2013 (Docket No. 177) is hereby denied.

The court hereby orders the Debtor twenty-one (21) days from the date this Opinion and Order has been docketed to file an amended Chapter 11 plan.

SO ORDERED.

---

**15.** The court must now determine the amount of PRLP's claim. Based on the above explanation and the sequence of events, it appears that PRLP became an under secured creditor sometime between December 2012 (based on Mr. Vallejo's appraisal report, Exhibit D–23) and February 11, 2013, when PRLP filed its objection to confirmation. Therefore, any interest, fees, and costs after such date may have to be adjusted.